THE PEOPLE *ex rel.* Attorney General,

*v.*

CHARLES J. BEATTIE.

*Filed at Springfield May 11, 1891.*

1. ATTORNEY AT LAW—*revoking license—for what cause.* While an attorney at law owes his client the duty of fidelity, he also owes the duty of good faith and honorable dealing to the court before whom he practices. He is an officer of the court, and his high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice. He violates his oath of office when he resorts to deception or permits his client to do so. He is under no obligation to seek to obtain for his client that which is forbidden by the law.

2. If he suffers false and perjured testimony to be presented to the court, with the possible result of inducing the latter to take jurisdiction of a cause in which there would otherwise be no power to act, and to grant a judgment or decree which the law would prohibit if the real character of the offered testimony were known, he can not shield himself behind his supposed obligations to his client.

3. An attempt by an attorney at law, in the conduct of a suit for a divorce, to impose upon and deceive the court by the introduction in evidence of testimony known by him to be false and perjured, whereby he obtains a fraudulent decree of divorce, is such professional misconduct as will justify this court in revoking his license.

4. If the solicitor of a party suing for a divorce, after the hearing and before the court has had time to examine the evidence, informs his client that a divorce has been granted, and in consummation of the fraud gives her a paper purporting to be a true copy of the decree when no decree at all has been entered, and thereby enables and assists her in procuring a marriage license and to get married before obtaining a divorce, this misconduct and fraud will justify this court in striking his name from the roll of attorneys.

5. Where a solicitor in a suit for divorce procures or permits his client to swear falsely to a material fact going to the jurisdiction of the court, with full knowledge of its falsity, without informing the court of the fact of its falsity, and afterward seeks to avail himself of such testimony by giving other evidence depending upon such perjured testimony for its materiality, and obtains the divorce, this will furnish ample cause for revoking his license to practice law.

6. DIVORCE—*residence in the State one year jurisdictional.* Where a wife seeks a divorce from her husband in this State for cruelty or

desertion committed outside of this State, she must show that she has resided in the State one whole year next before the filing of the bill. Without the jurisdictional fact,—one year's residence in the State,—all proof of cruelty or desertion in another State becomes wholly immaterial and worthless.

This is a motion made by the Attorney General in this court for leave to file an information against Charles J. Beattie for misconduct as a licensed attorney at law of this court. The material facts appear in the opinion of the court.

Mr. GEORGE HUNT, Attorney General, and Mr. H. J. KENDIG, for the relator.

Mr. W. P. BLACK, and Mr. C. STUART BEATTIE, for the respondent.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is an information by the Attorney General, in the name of the People, at the relation of five members of the bar of Cook County in this State, charging Charles J. Beattie, the respondent herein, a practicing attorney in the City of Chicago, with unprofessional conduct, and asking that an order be entered striking his name from the roll of attorneys of this Court and debarring him from the right to practice law, or to exercise the powers or privileges of a licensed attorney in the State of Illinois.

The charges against the respondent grow out of his conduct in a divorce suit begun and managed by him as the solicitor of the complainant therein. The suit was commenced on March 4, 1887, in the Superior Court of Cook County by Mrs. Ada E. Gordon for the purpose of obtaining a divorce from her husband, George B. Gordon, upon the alleged grounds of cruelty, desertion and adultery. A hearing of the case was had upon Saturday, May 7, 1887, at which the complainant, Mrs. Gordon, was examined orally before the Court, her testimony being taken in short hand by a stenographer. At the

close of her evidence, respondent as her solicitor handed to the Judge for his examination the depositions of A. S. and Mary Hallowell, theretofore taken in Canada to sustain the charge of cruelty, and the deposition of James L. Watson, theretofore taken in Chicago to sustain the charge of adultery. A decision was reserved until the Judge could examine these depositions, and until he had also further considered the testimony of Mrs. Gordon, which was written up by the short hand reporter and handed to him. In the course of two or three weeks, he informed respondent that he did not regard the evidence as sufficient to justify the entry of a decree, and thereupon respondent caused to be examined orally before the court on May 27, 1887, another witness, called by the name of R. J. Coffeen, for the purpose of further sustaining the charge of adultery. On the next day after the examination of the last witness, towit: on May 28, 1887, a decree was entered granting a divorce upon the ground of adultery alone.

1. It is charged that, in the affidavit and publication notice as to the non-residence of George B. Gordon, respondent stated such residence to be in "Buenos Ayres in the empire of Brazil, South America," when he knew that Buenos Ayres was in the Argentine Republic, and not in Brazil. If the charge were true, the purpose of such statement of the residence could only have been to prevent Gordon from receiving the notice required by the statute to be sent by mail. Respondent says, that Mrs. Gordon told him her husband lived in Buenos Ayres, Brazil, and that he did not know that there was not a Buenos Ayres in Brazil. She contradicts him in regard to the matter, but we give him the benefit of the doubt and hold that this charge is not sustained.

2. It is charged, that the respondent made contradictory and inconsistent statements under oath as to the date of Coffeen's examination before the court. We are satisfied from all the evidence and particularly from that of Latham, the short-hand reporter who took notes of the examination, that

Coffeen testified before the court on May 27, and not on May 7. It is true that, in his testimony given upon the present hearing, and in two answers under oath filed in March, 1889, the respondent stated at one time that Coffeen was examined on May 7, and at another time that he was examined on May 27. He urges in explanation of this matter that he did not intentionally misrepresent the date, but was at fault in his recollection. We give him the benefit of his explanation in regard to this charge.

3. It is charged that the respondent obtained the decree that was entered by introducing before the court testimony which was false and perjured, and which he knew to be false and perjured. The evidence of Watson was almost identically the same as that of Coffeen. These two witnesses—if there were two men whose real names were Watson and Coffeen—swore that George B. Gordon lived for about a month in the winter of 1885 at the boarding house of one Mrs. Giles, at No. 2126 Wabash Avenue in the city of Chicago, in an open state of adultery with a woman who was not his wife, but whom he represented to be his wife. These witnesses also swore that they were themselves boarding and occupying rooms at the same place, during the same month, and in this way knew that Gordon and the woman referred to slept in the same room. It is proven conclusively, that there was no such boarding house at the place named during the time mentioned; that no such man as Watson, nor any such man as Coffeen, ever boarded there, and that George B. Gordon was never in Chicago after the summer of 1882 until January, 1889. The so-called Watson and the so-called Coffeen have never been seen or heard of since they testified in this case. Their testimony, upon which alone the decree of divorce was based, was false in every particular.

It is claimed by the People, that Watson and Coffeen were one and the same person, and that a man named F. G. Coffey, who had been in the service of the respondent for several years;

posed as a witness at one time under the name of Watson before the Notary taking his deposition, and at another time before the Court under the name of Coffeen. This claim, how-ever, is not sustained by the proofs, but the respondent him-self does not deny that the testimony of Watson and Coffeen was manufactured. He says, that he examined these men as witnesses and introduced their statements before the Court, because he was imposed upon by his client, and made by her to believe that the evidence in question was *bona fide.*

Mrs. Gordon, who lived in Toronto, Canada, first learned of respondent as an attorney in December, 1886, through his advertisement in a newspaper. She then opened a corre-spondence with him, and quite a number of letters passed between them during the period from December 15, 1886, to March 4, 1887. On the latter day, she appeared in Chicago, and met the respondent for the first time at his office in that city. On the same day, he prepared and filed her bill for divorce. She remained in Chicago about three weeks, and re-turned to Toronto. She was not again in Chicago until the 6th or 7th day of May, 1887, when she came back to be pres-ent at the hearing. A number of letters passed between her and the respondent during the period from her return to To-ronto in March and her second visit to Chicago in May.

Respondent states, that Mrs. Gordon told him about the acts of adultery committed by her husband in Chicago when she was there in March, and at the same time gave him the names of Watson and Coffeen as the witnesses by whom she expected to prove such acts. He also states that on March 14, 1887, he prepared and read over to Mrs. Gordon a notice to take the deposition of Watson on April 23, 1887, before a Notary named G. R. Tucker in Chicago, and that this notice was addressed and mailed to her husband at "Buenos Ayres, Brazil, South America." He furthermore swears, that a man, calling himself Horace R. Milbourn and announcing himself to be a private detective from Toronto, brought Watson to his

office on the afternoon of April 23, 1887. On the same after-noon between five and six o'clock, the deposition of Watson was taken by respondent before Tucker at the latter's office.

Mrs. Gordon swears, that she never heard of Watson, nor of any acts of adultery committed by her husband in Chicago, until she went there in May, 1887, when to her surprise the respondent told her for the first time of his own discovery of Watson and of the latter's knowledge of her husband's alleged conduct in Chicago. She also swears, that she never author-ized respondent to charge her husband with adultery com-mitted in Chicago; that she never gave to him the names of Watson and Coffeen; that she never heard of Coffeen until 1889, when her husband returned from South America and instituted proceedings to set aside the decree of divorce; that she never heard of Milbourn. She is confirmed in her state-ments by a witness named M. H. Wilson, who came with her from Toronto to Chicago in May, 1887, and swears that he was present at the interview between her and respondent when the latter told her of his accidental discovery of Watson's knowledge of the adultery in Chicago. Wilson also swears, that no mention was then made of either Coffeen or Milbourn, and that he never heard of either of them until long after the divorce was granted.

We do not place any reliance upon the unconfirmed state-ments of Mrs. Gordon, in view of the false evidence given by her as hereafter referred to. Wilson, although unimpeached and uncontradicted in the material parts of his testimony, was influenced by a strong bias in her favor, as she evidently sought the divorce in order to marry him, and did marry him under the circumstances hereinafter related. If the question, whether or not the respondent knew the real character of the evidence given by Watson and Coffeen when he introduced it in court, depended upon the testimony of Mrs. Gordon and Wilson as weighed over against his own explanations, he would clearly be entitled to the benefit of the doubt which would ex-

ist in his favor. But a majority of the members of the Court are unable to reconcile the correspondence in the record with the statements which respondent makes upon this hearing.

The letters which passed between him and Mrs. Gordon prior to her coming to Chicago in March, 1887, make no reference whatever to the subject of adultery. They abound in inquiries on her part and answers on his part, as to the requirements of the Illinois law when a divorce is asked upon the grounds of cruelty and desertion. She had lived in Winnipeg, Manitoba, with her husband, who was a practicing lawyer, for several years prior to July, 1884, when a separation took place between them. In March, she had expressed to the respondent her suspicions, that improper relations had existed between her husband and a lady in Winnipeg, but had also stated that she would not be able to verify her suspicions by proof. She first alludes to the subject of adultery in her letter of April 11, 1887, to the respondent, and therein states that she had consulted a prominent Canadian lawyer, who had advised her that a divorce obtained in the United States for any other cause than adultery would not be recognized in Canada, and then suggests that a private detective in Winnipeg be employed to make inquiries there as to his movements while he was in that place. If, in March, she had informed respondent that she could prove her husband's adultery in Chicago, and had given him the names of Watson and Coffeen as the witnesses who would furnish such proof, why does she not refer to it in the letter of April 11? Why does she propose to send to Winnipeg to get the evidence, which she had already provided for getting in Chicago?

She again wrote to respondent on April 25, 1887, and refers to the subject of procuring evidence of adultery in Winnipeg. No reference is made to Watson and Coffeen. If she knew, before she left Chicago in March, that Watson would be examined in Chicago on April 23 as to her husband's adultery committed in that city, why does she make no allusion to it

in her letter of April 25? Why does she not ask whether Watson's testimony had been taken on the 23d according to the notice given and the arrangement made in March? Why does she still talk of looking up evidence of adultery in Winnipeg, if she knew that respondent had two days before obtained evidence of adultery in Chicago?

On April 27, 1887, the respondent answered the letters of April 11 and 25, and in his answer commented upon the Hallowell depositions as not being strong enough in their proof of cruelty; sent a commission to take the depositions of Mr. and Mrs. Smith, who could only testify to facts bearing upon the question of desertion, with the request that the depositions be taken on the next Monday and forwarded by mail; claimed that no foreign court could inquire into the regularity of decrees of Illinois courts of chancery; and closed with the following words: "If you are here the Thursday of next week, it will be ample time to be ready for trial." On April 23 respondent had taken the deposition of Watson, and yet makes no mention of that fact in the letter of April 27, although the latter letter was written in response to two communications from Mrs. Gordon, which suggested the idea of seeking in Winnipeg the same kind of evidence which Watson had already given in Chicago. If Watson's testimony was genuine and bona fide, and believed to be such, why not speak of it? Was respondent afraid that Mrs. Gordon would rebel against the introduction of that testimony as false? Or was he so conscious of its falsity that he dared not mention it in a letter?

On April 29 Mrs. Gordon wrote to respondent expressing her astonishment at his comments upon the Hallowell depositions, chiding him for his failure to take the depositions, upon the subject of cruelty, of Miss Clark in Canada and Miss Abby in England, and using the following language: "I feel so vexed, for you've had plenty of time since March, and I certainly see no use in going to Chicago next week, as there'll be no evidence at all. * * * If you were too busy to un-

dertake my case and do it justice   *   *   *   why did you not tell me so, and all this time would have been saved? If put off now, as it must be, to collect more evidence, how long will I have to wait?   *   *   *   I cannot afford to go up to Chicago till quite necessary.   *   *   *   I have written to Winnipeg myself now to see if any other evidence can be obtained, and you will likely hear from there shortly. It is useless speaking of our courts as you do, for of course, you don't know our laws; and if what evidence I suggested could be obtained, I don't see why you object to trying to get it for me.   *   *   *   Our lawyers here must know what is right.   *   *   *   The thing now is this: when will it have to be deferred to? What is the earliest date? And will you try for Miss Clark's evidence or not?" etc.

This letter of April 29 is wholly inconsistent with the idea that Mrs. Gordon, when writing it, had any knowledge of what Watson had sworn to, or of what Coffeen was ready to swear to. If she had such knowledge, it is impossible to believe that she would have written: "I certainly see no use in going to Chicago next week, *as there'll be no evidence at all.*" If she had known that there was proof of her husband's unfaithfulness in Chicago, she would not have spoken of writing to Winnipeg to get such proof. She would not have reproached the respondent for his unwillingness to aid her in getting such proof at Winnipeg, if she had been aware that he already had it in Chicago.

All the letters on both sides, both those written before the visit to Chicago in March and those written after such visit, are entirely silent upon the subject of adultery in Chicago, and upon the subject of any evidence to establish the commission of that crime in Chicago. But that which we find it most difficult to understand is the following letter which respondent wrote to Mrs. Gordon on May 2, 1887, five days before the hearing:

"*Mrs. Ada E. Gordon*—Your very ill-natured letter of the 29th ult. has been received. In reply permit me to say that I wrote a letter to Kate Clark, and sent commission to take her deposition in your case, on the same day that I wrote to Mr. Hallowell, and sent commission to take his deposition. Kate Clark has not answered my letter, and the commission has not been returned (or her deposition) to the Superior Court. I have performed my duty if the Clark woman failed in hers. When you gave me in detail the facts and circumstances of your case, you stated very distinctly and unequivocally that you could not prove adultery against your husband, and you relied on the ground of 'cruelty' and 'desertion' for a decree. Since then you have, you say, been advised by other counsel, that in order to have a valid decree you must prove adultery against your husband, and you suggest to me the employment of a detective for that purpose. I assure you that I never employ detectives in my cases,—they are generally vile knaves who deal in falsehood and perjury; but if my clients desire to employ them they have the right to do so. I am not the keeper of their consciences. If a detective offers testimony that seems fair on its face, and I have no knowledge that it is false, I will present it in the case, but I will not employ a detective or advise his employment. In this case there is no defense, and your testimony will stand uncontradicted, and with the corroborating testimony of the Hallowells you will obtain a decree of divorce on the grounds of cruelty and desertion. That of course was the original design and the scope of the bill. If you are here on Saturday next you will have your decree; if you are not here it is no fault of mine. However, it may be as well to understand that I never suffer any scolding or dictation from my clients. I know better how to conduct their cases than they do, and I conduct my cases my own way. If you could have proved adultery you ought to have filed your bill where the adultery was committed, and not have waited to gain a residence here for that purpose."

A little more than a week before he wrote this letter, respondent had taken the deposition of Watson and had it in his possession, and intended to present it to the court on the hearing, and did afterwards so present it. What reason could there be for the ominous omission of all reference to that deposition in the letter of May 2 ?

If, when Mrs. Gordon gave him "in detail the facts and circumstances" of her case, she told him about Watson and Coffeen, and the woman at 2126 Wabash Avenue, why does he say to her on May 2 : *"you stated very distinctly and unequivocally that you could not prove adultery against your husband?"* Here is an admission that she told him, when she was in Chicago in March, that she could *not* prove àdultery against her husband. He says that he was angry and excited when he wrote the letter, and intended to refer to adultery in Winnipeg and not to adultery in Chicago, and neglected to insert the words, "in Winnipeg." This explanation is not satisfactory. He uses a general term without any limitation as to place. There is the same omission of the words, "in Winnipeg," when he speaks of the advice given by other counsel that she "must prove adultery ?" What is the meaning of the last sentence of the letter? In telling her that, if she could prove adultery she ought to have filed her bill where the adultery was committed, he negatives the idea that she could prove adultery where the bill had already been filed. The intimation is as plain as it can be, that the bill had been improperly filed in Illinois if the divorce was to be asked upon the ground of adultery. It seems like mockery to talk thus to a woman, who already knew that Watson had sworn to the occurrences at 2126 Wabash Avenue, and that Coffeen stood ready to take the stand in confirmation of Watson.

It is impossible to reconcile the letter of May 2 with that sense of right, which should mark the conduct of an honorable lawyer. If Mrs. Gordon had told respondent that she expected to prove adultery in Chicago by Watson and Coffeen,

then the language of his letter of May 2 is untruthful, and could only have been intended as a mask. If she was ignorant of the false testimony, the silence of this letter can be attributed to nothing else than the fear to state in writing what she might not approve of, and what might thereafter work harm to himself. He says: "I never saw her between the time that she left my office three weeks after the filing of the bill and the time that she returned on the 7th of May. *She communicated to me nothing in the meantime unless what appears in her letters.*"

Respondent says in reference to the letter of May 2 : "*it was a letter that she could understand very distinctly and that she could not make any mistake about,*" etc. If, when he said to her : "you stated very distinctly and unequivocally that you *could not* prove adultery against your husband :" she thereby understood him to say, that she had stated that she *could* prove adultery against her husband in Chicago, then he and she were cloaking their thoughts in language, which had a different meaning for them from that which would be conveyed to any body else. If such a construction as this is to be placed upon the letter, the conclusion is irresistible, that the respondent was aiding and abetting his client in a scheme to impose false evidence upon the court.

Elsewhere in his testimony respondent speaks as follows of the letter of May 2: "Of course it can be seen by any one that there are portions of it that contradict the whole record in the case    *    *    *    it can be perceived by this letter that *I could not have had the circumstances of her case in mind,* because I stated to her in this letter that she should not wait to gain a residence here. Of course nobody ever claimed that she waited to gain a residence here, so that that particular part of the letter must have had reference to something else; at least I must have had the circumstances in my head of some person waiting here to get a decree instead of Mrs. Gordon," etc. It does not seem natural or reasonable to suppose,

that the references in the letter of May 2 were to some other suitor than Mrs. Gordon, and to some other case than hers. Such a supposition can hardly be creditable to the shrewdness or intelligence of a man, who had practiced law for more than thirty years, even after all allowances are made for the effects of anger and forgetfulness.

4. It is charged that the respondent gave to Mrs. Gordon on May 7, 1887, a paper purporting to be a certified copy of a decree of divorce, and thereby led her to believe that she had been divorced by the proceedings had in court on that day, when, as matter of fact, he knew that no decree of divorce had yet been entered, or would be entered for some time thereafter.

It is proven beyond question, that respondent gave Mrs. Gordon a copy of a decree of divorce on May 7, shortly after the hearing in court in the forenoon of that day. The copy has been produced in evidence, and is in the record. It is drawn upon a printed form, eleven lines of it being in print, and eleven or twelve lines being in the handwriting of respondent. It is in the usual form of a decree of divorce, finding the defendant guilty of both adultery and cruelty as charged in the bill, and giving the custody of the child to the complainant. It has the title of the cause and general number of the case upon its face. On the back of it are endorsed the general and term numbers, the name of the Superior Court of Cook County, the title of the case, and the name of the respondent as solicitor. It has no date. Upon its face and at the bottom of it are the notarial seal of the respondent and these words, written in his own handwriting: "A true copy. Chas. J. Beattie."

It is also proven beyond question, that, on May 7, shortly after the hearing before the court, Mrs. Gordon and Wilson obtained a marriage license from the office of the County clerk of Cook County, and were married on that day in Chicago by James S. Green, a minister of the Gospel, and left in the after-

noon of the same day for Toronto, with the copy of the decree given to them by the respondent in their possession.

Mrs. Gordon and Wilson both swear, that, when they came out of the court room in the forenoon of May 7 after the proceedings there had, respondent congratulated them, and said he had obtained the divorce, and took them down stairs to the county clerk's office, and introduced them to the clerk in charge of marriage licenses, thereby enabling them to procure a license; that they then went over to respondent's office, and he drew in their presence and gave to them the copy of the decree above mentioned, stating to them that such copy was all that it was necessary for them to have in order to be married, but that, if they chose to wait until the following Monday, he would give them another copy with the court's seal upon it, or would send the latter to them if they preferred to go home at once; that they then went to a clergyman and were married; that, a few days after the 28th of May, they received from him by mail the copy with the court's seal upon it.

Respondent swears, that he never went to the County Clerk's office with Mrs. Gordon and Wilson, and knew nothing about their marriage, until he received a letter from her dated May 16, and signed "Ada E. Wilson." He admits, that he gave her the copy of the decree above described, but says that Mrs. Gordon came into his office on May 7 while he was engaged in preparing such a decree as, he believed and had reason to think, would be entered; that she desired a copy to take home with her "*showing the trial of the proceeding;*" that, "without giving much consideration to the matter, and knowing that said Gordon understood the situation perfectly and fully, respondent replied that he did not see that there was any special objection to this, and thereupon made hastily a copy of the proposed draft of the decree, certified it as a true copy, and handed it to her, at the same time promising her that, as soon as he could procure the decree to be entered, he would send her a duly certified copy."

The correspondence between Mrs. Gordon and respondent before May 7 shows, that she intended to marry Wilson as soon as the divorce was obtained. Such intention on her part must have been well known to the respondent. A number of letters were written by Mrs. Gordon and Wilson to the respondent between May 7 and May 31, no one of which in express terms informs him of the fact of their marriage, but all of which assume that he knew all about the marriage. These letters ask him to send forward the copy of what they call "the *record of the court.*" They indicate very plainly, that the writers, who were residents of a foreign dominion, were ignorant of the course of legal proceedings in American courts, but the language of the letters clearly shows the belief of both Wilson and Mrs. Gordon, that there was already a "record" of the decree of divorce. They were asking for a copy of "the record of the court" as made, and not the copy of a record to be made. Respondent admits, that he learned of their marriage through the letter of May 16, and yet, although the decree of divorce was not actually entered until May 28, he never advised them of the illegality of such marriage.

A majority of the members of the court are not satisfied with respondent's explanation of his conduct in giving to these parties this copy of a decree. Of what was the paper thus given them a copy? When it was handed to them on May 7, no decree of divorce had been granted. None was granted until May 28, and then for adultery only, and not for cruelty. Respondent could not have known certainly, when he furnished this copy, that the divorce would be allowed at all. The oral evidence of Mrs. Gordon had not then been written up and submitted to the court, as was required by the rules of practice in divorce cases, nor had the depositions of Watson and the Hallowells been then examined by the court. As matter of fact, the testimony of all these witnesses was afterwards held to be insufficient. It was a most extraordinary act to give to these parties, under the circumstances then existing, a certi-

fied copy of a decree which had not yet been entered. When a paper is certified to be a true copy, the general understanding is that it is intended to be a true copy of something already existing, and not of something which is to be brought into existence in the future. The granting of the marriage license, the furnishing of a copy of the decree, and the marriage itself were three occurrences, which took place within so short a time of each other, that they may almost be regarded as parts of one transaction; and the conclusion is almost irresistible, that the license would not have been issued, and the marriage would not have taken place on that day, if the copy in question had not been made out and given to the parties.

If respondent assisted Mrs. Gordon and Wilson in obtaining a license on May 7 with a view to their marriage on that day, he aided in the consummation of an unlawful marriage, because he knew that she was not then legally divorced. If he gave them the paper purporting to be a copy of a decree, and thereby induced them, or permitted them, to believe that the court had granted a divorce in the pending case, he deceived them and placed it in their power to consummate an illegal marriage, whether he actually knew of such marriage or not. If he gave them the copy in question, accompanying it with the information that it was merely the draft of a proposed decree and that no decree had been actually entered, but with the understanding that they were to show it to their friends in Canada as evidence of a divorce, then he aided them and united with them in the perpetration of a fraud. He had said to Mrs. Gordon in the letter of May 2: "*If you are here on Saturday next, you will have your decree.*" This language, taken in connection with the fact that, on May 7, which was the Saturday referred to, he did actually give her a copy of a decree, tends to confirm her statement and that of Wilson, that they were induced to regard such copy as evidence of a divorce legally granted on that day.

5. Another charge made against the respondent is, that he attempted to deceive and impose upon the court, and to induce the court to grant a divorce upon the ground of cruelty committed in Canada, by permitting evidence to be presented to the court for the purpose of showing that Mrs. Gordon had resided one year in Cook County, Illinois, prior to the filing of her bill, when he knew such evidence to be false and that Mrs. Gordon had never been a resident of Cook County, but was and had always been a resident of Canada.

All the members of the court are of the opinion that this charge is sustained by the proof, and that the conduct of the respondent in relation to the matters involved in the charge was an inexcusable violation of his duty as a practicing lawyer. We proceed to give the reasons upon which we base the conclusion thus reached.

Section 2 of the Divorce Act of this State provides, that "no person shall be entitled to a divorce in pursuance of the provisions of this Act who has not resided in the State one whole year next before filing his or her bill or petition, unless the offense or injury complained of was committed within this State, or whilst one or both of the parties resided in this State." Therefore, where a wife seeks a divorce from her husband in Illinois for acts of cruelty which have been committed outside of this State, or for desertion which has taken place outside of this State, she will not be entitled to the divorce, unless she shows, either that she had resided in the State one whole year next before filing her bill, or that her husband was guilty of such cruelty or desertion while he or she or both of them resided in Illinois. Respondent admits that he knew this to be the law, and that he so advised Mrs. Gordon in his consultations with her.

In the divorce case now under consideration, it was not claimed or pretended that the defendant was guilty of cruelty or desertion while he or his wife or both of them resided in Illinois.

The respondent admits, that the only cruelty and desertion, which Mrs. Gordon charged against her husband, took place in Canada, and that he knew such to be the fact when he filed the bill. He says in his testimony: "when she gave me the facts of her case, she simply stated to me, that she could only prove desertion and cruelty in Winnipeg, in Canada."

When respondent filed the bill for Mrs. Gordon, he knew that she was not then a resident of Illinois, and that she had not resided in Illinois one whole year "next before filing her bill." He admits both in his answer and in his testimony, that he knew her to be a non-resident of this State. He says: "She never told me she was a resident of this State; she told me she was a resident of Canada."

It follows, that, when Mrs. Gordon's bill was filed on March 4, 1887, she was not entitled to a divorce in this State on the ground of either desertion or cruelty; first, because she had not resided one whole year in Illinois; second, because the only cruelty or desertion which she could prove, had taken place outside of Illinois. All her proof of cruelty or desertion would be immaterial and valueless without proof of a year's residence in Illinois next before the filing of her bill. Such being the state of the case, and such state of the case being well understood by the respondent, what did he do?

He inserted in the bill for divorce the following allegation: "your oratrix is an actual resident of the city of Chicago in the county of Cook and State of Illinois, and has resided continuously in said city, county and State for and during the last preceding five years, and within the territorial jurisdiction of this Honorable Court." This statement was false, and was known by the respondent to be false, when he wrote it, and permitted Mrs. Gordon to sign the bill containing it. He explains its insertion in the bill by saying that it was a merely formal allegation, and that the bill was not sworn to. Without stopping to comment upon the sufficiency or insufficiency of

the explanation thus offered, we proceed to notice what further steps the respondent took in the premises.

On April 6, 1887, he had commissions issued to take the depositions of Kate Clark and of A. S. and Mary Hallowell in Canada for the purpose of proving cruelty. On April 27, 1887, he had another commission issued to take the depositions of Mr. & Mrs. Smith in Canada for the purpose of proving desertion. He well knew that the cruelty and desertion, which he thus sought to establish, had occurred in Canada and not in Illinois. He knew that whatever the Hallowells would say in response to the interrogatories, which he drew and addressed to them, calling for a statement of such instances of cruelty as they had knowledge of, would have reference to acts done outside of this State. Why did he issue these commissions, if the allegation above quoted was merely formal? The depositions, when returned, would be utterly worthless without proof of a year's residence in Illinois.

In the letter of May 2, after the depositions of the Hallowells had been taken, respondent wrote to Mrs. Gordon that, with their testimony and her own, she would "obtain a decree of divorce *on the grounds of cruelty and desertion; that of course was the original design and scope of the bill.*" As the only cruelty or desertion, which the Hallowells had testified to and which Mrs. Gordon could truthfully testify to, had occurred in Canada, it is difficult to understand how she could obtain a divorce on either of those grounds, unless it was the intention at that time to attempt to show upon the hearing, that she had resided one year in Illinois. If proof of such residence was to be offered, it cannot be said that the allegation of the bill was designed to be a merely formal matter. Such allegation must have been regarded as being more than formal when it was inserted in the bill, if "the original design and scope of the bill" was to obtain a divorce for acts of cruelty and desertion which had taken place no where else except in Canada.

Let us see what took place at the hearing on May 7. In giving her testimony before the court, Mrs. Gordon swore, that she had lived in Cook County one year continuously prior to the filing of her bill. By so swearing she committed perjury. She says: "He (Mr. Beattie) told me on the way over to the court house, that, if the judge asked me if I lived here a year, I was to say, Yes." Respondent denies that he told her thus to swear to what was false. Let it be admitted that he, rather than she, is to be believed. What then? He sat in the court-room and heard her false statement, and permitted it to go unchallenged. That no injustice may be done him, we quote his explanation. He says in his answer to the information: "It is true, that said Ada E. Gordon did, in answer to certain questions put to her by the court, state that she had been a resident of the State of Illinois continuously for one year preceding the filing of her bill, which statement was a great surprise to this respondent, and was understood at the time by respondent to be untrue in fact. But respondent regarded the testimony at the time as immaterial, in view of the evidence in the case establishing the commission of adultery by the defendant in Chicago, and being taken by surprise by the client in said testimony, respondent, called upon suddenly to determine whether to allow to pass a statement made by his client, for which respondent was in nowise responsible, which was untrue in fact, but was at the time by respondent deemed to be immaterial, or to then and there correct such statement, with the possibility that he would thereby discredit his client before the court, and possibly prejudice her case, respondent permitted the evidence to pass without question or correction, feeling that the responsibility therefor could in nowise be charged against him, as his client was a woman of exceptional intelligence, and had been distinctly advised by respondent in advance that it was not necessary to either aver or prove residence in Cook county, in view of the evidence establishing the commission of adultery in said Cook county."

According to this explanation, there was a conflict in his mind between his sense of duty to the court and his sense of duty to his client. Being in doubt whether to call the attention of the court to the false testimony, or to let it pass in silence, he finally chose the latter course. Whether or not silence was justifiable under these circumstances, it is not necessary to enquire. It is sufficient to say, that the respondent was not content with silence. After his client's falsehood was uttered, he sought to make use of it. He continued to press upon the attention of the court the question of the defendant's alleged cruelty, knowing that proof of cruelty would be immaterial without the false statement as to residence to rest upon.

The record shows, that, after the judge had ceased to examine Mrs. Gordon, the respondent himself asked her the following question, and received the following answer: "I will ask you if at any time he was cruel to you by way of physical cruelty? A. Yes Sir, he knocked me downstairs and struck me." Respondent knew, that the evidence thus called out was of cruelty that had taken place in Canada, and yet just a moment before he had heard the witness falsely swear to a year's residence in Illinois, without which residence the cruelty in Canada would be unavailing.

But this was not all. Respondent took no steps to withdraw the testimony upon the subject of cruelty and submit his case upon the charge of adultery. On the contrary, as soon as Mrs. Gordon had left the witness stand, he handed up to the court the depositions of the Hallowells, tending to prove acts of cruelty committed outside of the State of Illinois, in order that such depositions might be considered by the court in connection with the false testimony of his client as to a year's residence in Illinois.

Proofs were presented to the court in support of the two charges of cruelty and adultery. The case was placed before the mind of the judge in such a way, that he might grant the

divorce on either one of the charges, or on both, according to his view of the sufficiency of the evidence. He was imposed upon by the sworn statement of the complainant as to her residence in Illinois. If he had known, that her statement was false, he would not have considered the testimony as to cruelty, but he did consider it.

The lawyer's duty is of a double character. He owes to his client the duty of fidelity, but he also owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions. He violates his oath of office when he resorts to deception, or permits his clients to do so. He is under no obligations to seek to obtain, for those whom he represents, that which is forbidden by the law. If he suffers false and perjured testimony to be presented to the presiding judge, with the possible result of inducing the latter to take jurisdiction of a cause, in which there would otherwise be no power to act, and to grant a judgment or decree which the law would prohibit if the real character of the offered testimony were known, he cannot shield himself behind his supposed obligations to his client. A non-resident of Illinois has no right to a divorce for acts of cruelty committed outside of Illinois, no matter how extreme or repeated such acts may have been. In such cases, residence in the State is a jurisdictional fact.

But the respondent went even further. On the very day, on which the false evidence was given by his client, he prepared a draft of a decree to be submitted to the court, and did afterwards so submit such draft. He says in his evidence: "I had in the meantime prepared * * * a draft of the decree, hoping to present it to the judge that afternoon if I could find him." In his answer to the information he says: "respondent went to his office and proceeded to prepare * * *

a draft of the decree, which, he supposed, would be entered, *in view of the testimony that had been given;* \* \* \* the original draft of this proposed decree was given by respondent to the court." A copy of the draft of the decree thus referred to has been introduced in evidence, and is in the record. It contains the following findings : "that the said defendant has, since the time of his marriage with the complainant, been guilty of adultery as charged in said bill of complaint, and that *the said defendant has also been guilty of extreme and repeated cruelty as charged in said bill of complaint.*"

It is true, that, after the judge had examined all the evidence submitted to him, including that of Coffeen taken on the 27th, he erased the finding as to cruelty, and entered the decree upon the finding as to adultery. Nevertheless, the fact remains, that the respondent presented a decree to the court containing a finding that the defendant had been guilty of cruelty, and expected that it would be entered "in view of the testimony that had been given." What was the testimony that had been given ? Testimony that the complainant had resided one year in Illinois, as well as testimony that acts of cruelty had been committed.

It is clear, that in the preparation of the bill, in the taking of depositions, in the examination of witnesses upon the hearing, in the submission of testimony to the court, in the drafting of the decree presented to the court, the respondent intended to take his chances, and did take his chances of procuring a decree either upon the ground of adultery, or upon the ground of cruelty. The conclusion is abundantly established, that he intended to deceive and attempted to deceive the court by testimony of his client as to a residence in Illinois which he knew to be false.

Some unworthy act has been encountered at every stage in the investigation of this divorce case. No step can be taken in it without meeting with something that requires explanation. From the beginning to the end of it, the proceeding

was a gross fraud—an outrageous imposition upon the administration of justice. It is impossible that any lawyer of intelligence could have conducted it without seeing and knowing its real character. If Mrs. Gordon originated and inspired all the wrong that was done, her solicitor either actively assisted her, or purposely shut his eyes to what she was doing. Her case had no merits whatever.

Let the rule in this case be made absolute, and let an order be entered striking the name of Charles J. Beattie, the respondent herein, from the roll of attorneys of this court in accordance with the prayer of the information filed by the Attorney General.

*Rule made absolute.*