IN THE MATTER OF LARRY S. LOIGMAN, AN
ATTORNEY AT LAW.

Decided October 18, 1989.

## ORDER

The Disciplinary Review Board having filed a report recommending that LARRY S. LOIGMAN of MIDDLETOWN, who was admitted to the Bar of this State in 1977, be publicly reprimanded for his conduct in three matters: 1) for his representation of a police officer following his employment by the police department, during the course of which he had been involved in various investigations involving the officer, in violation of *DR* 9-101(B); 2) for filing an unwarranted criminal complaint against his client because of his client's failure to pay the $60 balance of a $160 legal fee, in violation of *DR* 7-102(A)(2); and 3) for his gross neglect of a matter and failure to communicate with his client,

And the Court having heard the argument of counsel,

And good cause otherwise appearing;

It is ORDERED that the report of the Disciplinary Review Board is hereby adopted and that LARRY S. LOIGMAN be and hereby is publicly reprimanded for his ethical violations; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this Order and the full record be added as a permanent part of the file of said LARRY S. LOIGMAN as an attorney at law of the State of New Jersey; and it is further

ORDERED that LARRY S. LOIGMAN reimburse the Ethics Financial Committee for appropriate administrative costs.

## APPENDIX

### Report and Recommendation of the
### Disciplinary Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon three presentments and one recommendation for a private reprimand filed by the District IX (Monmouth County) Ethics Committee.

### I. The Asmar Matter

In 1977, respondent filed a civil complaint on behalf of patrolman Robert Oches of the Middletown Police Department ("MPD") against Robert Asmar ("Grievant") for defamation and malicious prosecution. This complaint arose as a result of a criminal complaint for perjury that grievant filed against Oches in 1977.

In early 1979, while the Oches suit was in process, another MPD patrolman, James Wladyko, filed various charges against respondent with the Monmouth County Ethics Committee ("Committee"). The committee, after investigation, filed a

presentment on July 17, 1980. The presentment found that respondent, who had been previously employed with the MPD, was involved in various police investigations relating to grievant and either used or could have used such information in pursuit of the Oches matter. The information was acquired solely as a result of respondent's employment with the MPD. The committee, therefore, concluded that respondent had violated *DR* 9–101(B) by accepting "private employment in a matter in which he had substantial responsibility while he was a public employee."

After considering the committee's presentment, this Board determined that a private reprimand was appropriate. A letter of private reprimand was issued on March 5, 1981. The letter stated that respondent had placed himself "in a situation where there could be a conflict of interest in filing the civil suit against Mr. Asmar" and that such conduct resulted in an appearance of impropriety. The letter stated further that respondent had violated *DR* 9–101(B). This notwithstanding, respondent continued to represent Oches in the civil complaint against grievant, even after he received the letter of reprimand.

On March 26, 1981, respondent filed a motion to compel grievant (defendant) to comply with the terms of a settlement agreement negotiated in November of 1980. This "settlement" involved the payment of $450 and a letter of apology to Oches.

There was considerable disagreement as to the nature of the apology. Further motions and cross-motions were filed by both respondent and grievant's attorney. On June 11, 1981, respondent filed a cross-motion requesting that grievant be compelled to comply with a court order dated May 28, 1981. This motion was filed ten months after respondent received a copy of the committee's presentment and three months after the letter of private reprimand was issued.

Finally, grievant signed a letter of apology dated July 1, 1981. This letter was considerably pared down from an earlier draft suggested by respondent on March 26, 1981.

On June 25, 1984, a formal hearing was held before the committee as a result of a complaint filed by grievant on June 20, 1981. Respondent, his attorney, and grievant appeared at the hearing.

On September 19, 1984, the committee issued a presentment to the DRB. The presentment found that:

> Respondent's continued representation of [Oches], in the 'settled' matter was a continued unethical and unprofessional act in direct violation of the letter of reprimand setting forth that his conduct resulted in the appearance of impropriety being created concerning the possible use of his position with the Middletown Police Department for his private advancement.

The presentment found further that respondent had violated DR 1-102(A)(1), which states that "a lawyer shall not violate a Disciplinary Rule" and, again, DR 9-101(B), which states that "a lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee."

## II. The McCabe Matter

In November 1981, respondent was retained by Thomas McCabe ("grievant") to form a corporation by the name of McCabe, Inc. Respondent received $100 from grievant on the date of their first conference.

On December 15, 1981, grievant went to respondent's office and received the corporate kit and related materials. Enclosed with these materials was respondent's bill dated December 15, 1981, for a total of $160. After the $100 retainer was applied to that total bill, there remained a balance of $60. On January 18, 1982, respondent sent grievant a second bill for the $60 balance.

After two billings and no payment, on March 8, 1982 respondent filed a criminal complaint against respondent and the newly formed corporation. These complaints alleged violations of N.J.S.A. 2C:20-8 (theft of services), which provides, in pertinent part:

A person is guilty of theft if he purposely obtains services which he knows are available only for compensation by deception or threat ... to avoid payment for the service.

On the same date that the complaint was filed, March 8, 1982, grievant's wife went to respondent's office and paid him the $60. Respondent had already signed the criminal complaints that same morning. The payment of the $60 was made without any knowledge of the criminal complaints. The complaints were subsequently dismissed on the ground that the state had not sustained its burden of proof.

A formal hearing was held before the ethics committee on February 5, 1985. Grievant testified that he fully intended to pay respondent the $60 and that there was no dispute regarding either the quality of the services rendered by respondent or the amount of the bill (T. 11, 12) [1]. Grievant explained why he had not paid the $60 before March 8, 1982:

My wife was working in the city and commuting. She was handling most of the bills at the time. Her only day off was Monday. She didn't get home until eight or nine o'clock at night and it just was inadvertently overlooked [T. 12–13].

Respondent testified that grievant told him, after the first billing in December 1981, that "[l]awyers are all rich, you don't need the money" [T.37]. As a result, respondent was convinced that grievant had no intention of paying the bill. He explained his reasons for filing the criminal complaint:

"I was somewhat annoyed at [grievant's] refusal to pay. In view of his obvious financial ability to make the payment it was my impression that he was simply refusing to pay because he wanted to cheat me out of the money ... I filed the complaint because after several months had gone by and it was obvious that I was not going to receive payment from him, I thought that there should be both specific punishment of him and should be some sort of general lesson to people who would hear about the case. As a general rule, when someone has a bill to be paid, it should be paid [T.31, 32].

Following the ethics hearing, the committee concluded that respondent had violated *DR* 7–102(A)(2), by knowingly advancing an unwarranted claim in this matter; *DR* 7–102(A)(8), by

---

[1] "T" denotes transcript of the committee hearing on February 5, 1985.

engaging in conduct contrary to a Disciplinary Rule; *DR* 1-102(A)(1), by violating a Disciplinary Rule; and *DR* 7-105, by threatening criminal prosecution to coerce adjustment of private claims. The hearing panel report recommended a private reprimand. An attached letter by the committee chairman dated August 22, 1985, however, stated that "it was the consensus of the committee that the recommendation should be a presentment and *not* a private reprimand as the hearing panel so recommended."

### III. The Banfield Matter

Edwin Banfield ("Grievant") was the owner of the Banfield Moving and Storage Company. On September 27, 1982, one of his trucks was struck by a vehicle operated by Food Haulers, Inc. An initial police report was made at the time of the accident. Two weeks later, a contradictory report was filed, indicating that grievant's driver was at fault. Grievant then retained respondent to investigate the contradictory reports and to sue Food Haulers for damages. On December 21, 1982, respondent instituted an action on behalf of grievant in the Monmouth County District Court.

The complaint was initially dismissed in April 1983 because it was served on the wrong party, Shop Rite, rather than Food Haulers. The complaint was reinstated after proper service.

In July 1983, Food Haulers filed an answer and counterclaim. On July 22, 1983, respondent sent grievant a letter requesting answers to enclosed interrogatories by Food Haulers. Grievant unsuccessfully attempted to answer the interrogatories. His requests for assistance from respondent were ignored.

Respondent subsequently received notice from the Superior Court that grievant's case would be called for trial on November 14, 1983. When respondent appeared at the District Court calendar call, however, he discovered that grievant's case was not on the District Court trial list. It was the practice, in Monmouth County, that District Court matters for jury trial be

sent over to Superior Court, as the District Court had no facilities for juries. Consequently, a District Court case for jury trial would be called for trial in Superior Court. On November 15, 1983, grievant's complaint was dismissed for failure to respond to the trial call in the Superior Court.

Respondent was under the impression that grievant's complaint had been dismissed, prior to the trial call, for failure to answer interrogatories. On November 21, 1983, respondent sent a letter to the presiding judge of the District Court asking why the case had been dismissed for failure to respond to the trial call, when it had already been dismissed on other grounds. The Judge's clerk subsequently told him that "there had been some sort of mix-up" and that he should get his "client's answers to the interrogatories and then move to vacate the dismissal and not worry about the other dismissal" [2T.69].[2] Between November 1983 and May 1984, respondent told grievant that he needed answers to the interrogatories before he "could do anything" [2T.79].

On November 15, 1983, opposing counsel filed a certification claiming that the Food Haulers truck had sustained damages in the amount of $85.10 plus replacement rental expenses of $254, for an erroneously calculated total damage of $934.10. Respondent received a copy of this certification and noticed the error in calculation. He did nothing, however, to remedy the error and relied on the Judge's law clerk, who told him that a judgment on the counterclaim would not be entered until he could obtain answers to the interrogatories. On February 14, 1984, a default judgment was entered against grievant, based on the counterclaim.

Respondent did not notify grievant of the default judgment against him. Grievant first became aware of the default judgment in May 1984, when he received a letter from opposing counsel.

---

[2] "2T" denotes the transcript of the committee hearing on April 30, 1985.

Finally, grievant received a letter from respondent dated May 29, 1984, requesting him to answer interrogatories. Once again, grievant's subsequent requests for guidance went unanswered.

On September 1, 1984, grievant sent a letter to the Monmouth County Prosecutor expressing his dissatisfaction with respondent's representation.

On April 30, 1985, a formal hearing was held before the ethics committee. Respondent, his attorney and grievant appeared. The hearing panel report found that respondent's conduct "in neglecting the legal matter entrusted to him [had] clearly [arisen] to a violation of *DR* 6–101." It recommended that respondent be given a private reprimand. A dissenting member of the hearing panel did not find respondent's negligence to have risen to "gross negligence" or a "pattern of negligence or neglect", in violation of *DR* 6–101 and, therefore, recommended that the matter be dismissed.

## IV. The Novak Matter

Elizabeth Novak ("Grievant") was the sole stockholder of two corporations, San–Scho, Inc. and East of Eden, Inc. San–Scho held a liquor license and East of Eden owned five and one-half acres in Middletown, New Jersey.

Prior to grievant's acquisition of the two corporations in 1977–1978, East of Eden operated a tavern in Middletown known as the "Copper Top." It subsequently sold the liquor license and leased the tavern premises to San–Scho. Among the persons involved with East of Eden was Robert Asmar (the grievant in the Asmar matter). After her acquisition of San–Scho, grievant did not use the liquor license and made numerous attempts to sell it. In 1980, an attorney agreed to purchase the liquor license, but subsequently transferred it back to grievant. This sale fell through because of numerous objections to the renewal of the license made by respondent.

Respondent filed his first objection to the renewal of the liquor license in 1979. The gravamen of this objection, as well as those that followed, was that "the operation of the licensed premises by [grievant] [the 100% stockholder of the license], who is acting for Robert D. Asmar, cannot be accomplished without great detriment to the public safety and welfare." The objection further stated that "Asmar's numerous convictions make him ineligible by statute to hold a license or any interest therein." In short, respondent claimed that grievant was acting as an illegal "front" for Asmar.

The license was renewed in 1979. Respondent's administrative appeal was ultimately dismissed by the Director of the Division of Alcoholic Beverage Control ("ABC") on April 18, 1980. The proceeding was converted into a disciplinary investigation.

On January 11, 1983, grievant entered a plea of *non vult* to charges that resulted from the ABC's investigation. These charges stated, *inter alia*, that grievant had failed to show and disclose that Robert Asmar had an interest "directly or indirectly in the license applied for." Grievant agreed to divest herself of all interest in the license. The license was renewed, however, on June 27, 1983.

Again, respondent objected to this renewal and filed an appeal with the ABC on July 6, 1983. On December 14, 1983, he was granted a partial summary judgment which stated, *inter alia*, that Robert Asmar was a "notorious criminal" and/or a "person of ill repute" within the meaning of *N.J.A.C.* 13:2–23.5(a) and was disqualified from "employment by or business connection with the licensee [grievant]."

On April 16, 1984, respondent filed a class action against grievant, her two corporations, Asmar, and the State Attorney General. The basis of the eight-count complaint was the illegal "front" provided by grievant for Asmar. The suit demanded that the Attorney General institute proceedings against defen-

dants, that defendants divest themselves of the liquor license, and that the two corporations be dissolved.

On June 7, 1984, the Director of the ABC issued an order directing grievant to complete the transfer of the liquor license to a *bona fide* transferee. Because, however, grievant was unable to make such a transfer, the license was indefinitely suspended as of June 29, 1984.

On October 19, 1984, respondent's class action was dismissed for (a) failure to state a claim upon which relief could be granted and (b) lack of standing.

Finally, respondent objected to and appealed the renewal of the liquor license in 1984. The appeal was dismissed by the Director of ABC on July 10, 1985. The gravamen of this dismissal was that "since the licensee [grievant] has had her alcoholic beverage dispensing privileges suspended indefinitely until this license has been transferred to a *bona fide* purchaser, I cannot find that the community is facing any danger in her retaining such license while seeking a buyer."

Ethics hearings were held on April 30, 1985, October 9, 1985, November 26, 1985, and April 29, 1986. The hearing panel report found that respondent had violated *DR* 1–102(A)(5), in that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice;" *DR* 1–102(A)(6), in that a lawyer shall not "engage in any other conduct that adversely reflects on his fitness to practice law;" and *DR* 7–102, which provides that a lawyer, in representing a client, shall not file a suit or take other action on behalf of his client when he believes that such action would serve merely to harass or maliciously injure another or knowingly advance a claim or defense unwarranted under law. The panel filed a presentment.

A report from a dissenting member of the hearing panel recommended a dismissal, based upon the hearing panel's conclusion that respondent had probable cause for his initial objections to the renewal of the liquor license.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board finds that the conclusions of the committee, with the exception of the Novak matter, are fully supported by clear and convincing evidence. The Board finds also that respondent's actions, taken together, adversely reflect on his fitness to practice law and on the legal profession, in violation of *DR* 1–102(A)(6).

*The Asmar Matter*

Respondent had been employed by the Middletown Police Department prior to engaging in private practice. During the course of this employment, he was involved in various police investigations concerning grievant. In 1977, as a private practitioner, respondent filed a civil suit in behalf of a Middletown police officer against grievant. While this suit was pending, the ethics committee concluded that respondent had violated *DR* 9–101(B), by accepting private employment in a matter in which he had substantial responsibility while he was a public employee. Respondent received a copy of the committee's presentment in July 1980. Ultimately, this Board issued a private reprimand in March 1981. Respondent ignored both the committee and this Board and continued representation in the suit against grievant until July 1981.

Because respondent persisted in the improper representation, grievant filed this complaint. The committee concluded that respondent was in *continued* violation of *DR* 9–101(B) and also of *DR* 1–102(A)(1), which states that a lawyer shall not violate a disciplinary rule.

In similar situations, the Supreme Court of New Jersey has spoken as follows:

> If the Assistant County Prosecutor has investigated or participated in any investigation in any manner or to any extent, he should be *foreclosed* from representing in that or any related matter any person who had been the subject of that investigation or is indicted or tried as a result of that investigation [emphasis added].

> [*In re Advisory Opinion No. 361*, 77 *N.J.* 199, 202–203 (1978)]

Here, respondent admitted to the improper representation but argued, in mitigation, that there was no evidence that any impropriety had actually occurred.   Even assuming, *arguendo*, the force of this contention, the Court has clearly enunciated the thrust of *DR* 9–101:

> A lawyer must avoid even the appearance of impropriety, *DR* 9–101, to the end that the image of disinterested justice is not impoverished or tainted.  Thus it is that sometimes an attorney, guiltless in any actual sense nevertheless is *required* to stand aside for the sake of public confidence in the probity of the administration of justice [emphasis added].
>
> [*State v. Rizzo*, 69 *N.J.* 28, 30 (1975)]

Respondent further argued, in mitigation, that the committee's original presentment in July 1980 had not "yet put him on notice that what he was doing is wrong."  It is clear, however, that "notice" is not required.  In this case, both *Advisory Opinion No. 361*, and *Rizzo* make it clear that *DR* 9–101 is triggered without qualification, and that actual impropriety or lack of notice is irrelevant to the rule's operation.  Moreover, ignorance of the ethics rules and case law does not diminish responsibility for violation of the rules.  *In re Eisenberg*, 75 *N.J.* 454, 456–457 (1978).

Respondent contends, also as mitigation, that the improper representation began in his first year of practice, thus attributing the violation of *DR* 9–101 to his professional inexperience. He had been forewarned, however, by the committee's presentment, in July 1980, that he was in violation of *DR* 9–101(B).  He was formally chastised by this Board, in March 1981.  Respondent's improper representation continued well into June 1981, almost one year after the initial presentment and three months after the private reprimand was issued.  His behavior was not that of an inexperienced attorney, but that of a brazen and arrogant attorney showing little or no regard for the disciplinary authorities established by the Supreme Court of New Jersey.  When an ethics complaint is filed against an attorney, "such an attorney is not in any way at liberty to ignore a complaint because he believes it to be without substance, maliciously motivated or false in fact."  *In re Kern*, 68 *N.J.* 325,

326 (1975). Moreover, respondent's disregard of the committee's finding rises to the level of utter disrespect. When an attorney shows disrespect to an ethics committee, he shows disrespect to the State Supreme Court. *In re Grinchis,* 75 *N.J.* 495, 496 (1978).

Finally, respondent argues that it was difficult to obtain new counsel for his client because it was a small matter and "for all practical purposes it was over." Respondent claimed that the matter was "settled." The facts, however, show otherwise. Respondent received a copy of the first presentment in July 1980, finding him in violation of *DR* 9–101(B). The "settlement agreement," however, was not reached until November 1980. Moreover, this supposed "settlement" could not have been considered a resolution of the matter by any stretch of the imagination. After November 1980, the half-dozen motions and cross motions filed by both parties revealed a considerable dispute regarding the nature of the "settlement." As late as June 1981, grievant's counsel suggested that the matter be placed on the trial list. The settlement dispute persisted even after this Board's letter of private reprimand in March 1981. The matter was not finally resolved until July 1, 1981, over three months after the reprimand. Had respondent withdrawn from the case in July 1980, upon receipt of the committee's presentment, he would have had an easier time securing new counsel for his client. In any event, mere inconvenience in finding new counsel is no excuse for continued improper conduct. Furthermore, it appears that respondent did not even attempt to find replacement counsel.

An attorney must *immediately* "stand aside" from representation in the face of a *DR* 9–101(B) violation. *Rizzo, supra,* 69 *N.J.* 28 (1975). "Settlement agreements" can easily unravel and the appearance of impropriety, therefore, is greatly amplified.

*The McCabe Matter*

The facts are relatively undisputed. Respondent filed a criminal complaint against his client (grievant) alleging theft of

services because of grievant's failure to pay $60 in satisfaction of the balance of respondent's legal fee. This criminal complaint was filed fewer than three months after respondent sent the first of only two bills. The bill was paid by grievant, coincidentally, on the same day that the criminal complaint was signed.

After a careful review of the record, the Board concludes that there is no clear and convincing evidence that respondent filed the criminal complaint to coerce judgment of his claim for the $60. The facts clearly indicate that grievant paid the $60 without coercion from the criminal complaint. When payment was made, grievant was not even aware of the existence of the complaint. The Board, therefore, cannot concur with the committee's conclusion that *DR* 7–105 has been violated.

The Board does find, however, clear and convincing evidence that respondent engaged in conduct that adversely reflected upon his fitness to practice law, in violation of *DR* 1–102(A)(6), and knowingly advanced a claim unwarranted under existing law, in violation of *DR* 7–102(A)(2).

Respondent's conduct in this matter must be considered objectively and not subjectively. *In re Makowski*, 73 *N.J.* 265, 270 (1977). Respondent filed a criminal complaint fewer than three months after the first of only two bills. There was no evidence or indication that grievant deceived or threatened respondent out of his $60. Grievant had previously paid respondent $100. The filing of such a complaint, in these circumstances, was frivolous and wantonly litigious, lowering the reputation of the bar and adversely reflecting on respondent's fitness to practice law.

Respondent stated that his motivation for filing the complaint was "that there should be some sort of general lesson to people." We find this attempt at virtue, if believed, to be harsh and perverse.

The Board concurs also with the committee's conclusion that there is clear and convincing evidence that respondent knowing-

ly advanced an unwarranted claim, in violation of *DR* 7–102(A)(2). Again, there is no evidence that grievant was guilty of purposely obtaining respondent's services by "deception or threat." Respondent's "annoyance" at grievant's refusal to pay and desire to teach a "general lesson to people" supports the conclusion that the complaint was filed for reasons other than actual violation of the criminal statute.

### The Banfield Matter

The facts are uncontroverted, except with regard to the nature of the attorney-client relationship. Respondent instituted a civil action in behalf of grievant in December 1982. This action was dismissed at least twice. A default judgment was ultimately entered in favor of the opposing party. Respondent claimed that grievant was a "difficult client" and refused to answer interrogatories. Grievant, on the other hand, claimed that he did not know how to answer the interrogatories and that respondent failed to provide guidance after numerous requests.

Grievant's version of the attorney-client relationship appears to be the more credible one. It is difficult to believe that grievant would prejudice his own case. Even assuming, *arguendo*, that grievant was a difficult client, this is no excuse for the extent of respondent's neglect. Respondent initially served grievant's claim upon the wrong party; failed to answer the counterclaim; failed to appear in the proper court to respond to the trial call failed to notify grievant of the default judgment on the counterclaim; and failed to correct a typographical error in the opposing party's certification of damages (resulting in an increase of approximately $500 in the damages sought from grievant). Moreover, respondent clearly appears to have been cavalier with the case and his client when he sent a letter to grievant requesting answers to interrogatories, six months after the dismissal of the complaint and three months after the default judgment had been entered against grievant.

Regardless of whether a client intends to continue pursuing a claim, the attorney should inform the client of an imminent dismissal of the lawsuit. *In re Rosenthal,* 90 *N.J.* 12, 16 (1982). The Court, in that decision, also stated that "the failure to prosecute a claim and to communicate with a client warrants a public reprimand." *Id.* at 17.

It is all too clear that respondent's neglect of rudimentary aspects of a single, uncomplicated case rose to the level of gross neglect. Such neglect clearly resulted in an improperly inflated default judgment against grievant. It is also equally clear that grievant was left in the dark regarding the "progress" or status of his suit.

*The Novak Matter*

The facts of this matter are also undisputed. Respondent annually objected to the renewal of grievant's liquor license, claiming that she was an illegal "front" for a convicted felon. As a direct result of respondent's persistent protests, the liquor license was suspended indefinitely after grievant entered a plea of *non vult* to ABC charges. Buttressing the eventual success of respondent, was grievant's statement to the hearing panel that "this is all of the information that [respondent] has been trying to subpoena from me throughout all of those years." The hearing panel itself concluded that respondent had probable cause for his initial objections. This Board, therefore, does not concur with the committee's conclusion that respondent violated either *DR* 1–102(A)(5) or *DR* 1–102(A)(6).

Having concluded that respondent's conduct in the foregoing matters was unethical, this Board is left with the task of recommending the appropriate discipline. The purpose of discipline is not the punishment of the offender but "protection of the public from the attorney who cannot or will not measure up to the high standards of responsibility required of every member of the profession." *In re Getchius,* 88 *N.J.* 269, 276 (1982), citing *In re Stout,* 75 *N.J.* 321, 325 (1978). "The severity of discipline to be imposed must comport with the seriousness of

the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315 (1982). Therefore, mitigating factors are relevant and may be considered. *In re Hughes,* 90 *N.J.* 32, 36 (1982).

This Board finds little by way of mitigation. The Asmar matter appears to be the only matter in which respondent admits to any impropriety. Nowhere to be found is any expression of regret, contrition, or humility. The harsh and rigid expectations respondent applied to his own clients and others do not seem to apply to himself. The only mitigating factor that this Board can detect is that the public interest in proper and prompt discipline has been eroded by the passage of time. *See In re Verdiramo,* 96 *N.J.* 183, 187 (1984). It has been over three years since the filing of the last complaint.

In view of the above, the Board majority recommends that respondent be publicly reprimanded, based on the totality of his unethical conduct. Two members did not participate.

The Board further recommends respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.