IN THE MATTER OF LEON NIGOHOSIAN, AN
ATTORNEY-AT-LAW.

Argued May 27, 1981—Decided February 11, 1982.

*David E. Johnson, Jr.*, argued the cause for complainant, Disciplinary Review Board (*Colette A. Coolbaugh*, Secretary, attorney).

*John A. Schepisi* argued the cause for respondent.

PER CURIAM.

The Disciplinary Review Board (DRB) considered two presentments filed by the local District Ethics Committee and determined that Leon Nigohosian had been guilty of misconduct in two matters involving his clients Stoecker and Tuncay. In addition the Board found various minor violations suggestive of "inadequate record keeping." The DRB was satisfied that the latter had been remedied by respondent's hiring of a bookkeeper to oversee his accounts. It likewise concluded that Nigohosian's entering into a business transaction with a client without sufficient disclosure and without informed consent did not, under the circumstances, rise to the level of an ethical violation.

The DRB recommended that respondent be publicly reprimanded for his misconduct concerning Stoecker and Tuncay. After examining the complete record, we agree with the DRB's findings but entertain a different view of the appropriate discipline. Our discussion is limited to those ethical transgressions that have been established by clear and convincing evidence.

I

Stoecker Matter

William Stoecker was a defendant in proceedings brought against him in Superior Court, Warren County, by Panther

Valley, Ltd., on a lease agreement and note. On May 14, 1975 the parties through their attorneys (respondent did not then represent Stoecker) entered into a stipulation of settlement in open court. Under the terms of that stipulation Stoecker agreed to pay plaintiff $2500; if payment were not forthcoming by July 1, 1975, Stoecker was to give plaintiff a second mortgage for $3000 on certain real property owned solely by him, located in Guttenberg, New Jersey. The property was clearly identified on the record by reference to its date of purchase, the original purchase price, the amount of the first mortgage and balance remaining due thereon, the name of the mortgagee, and the present value of the property. Although Mrs. Stoecker was not a party to the Panther Valley litigation, she was in court at the time the case was settled. Inasmuch as her signature would be necessary on any mortgage instrument, to the end that her inchoate right of dower might be extinguished, Mrs. Stoecker expressed her agreement with the settlement, including specifically the requirement that she sign any mortgage.

However, rather than complete the settlement as agreed, Stoecker retained respondent to set it aside. On June 13, 1975 Nigohosian filed a notice of motion for that purpose, returnable June 27. The grounds alleged for setting aside the settlement were inadequate representation by Stoecker's former attorney and coercion in the effecting of the settlement. The motion was not heard until October 17, 1975. In the interim Stoecker neither paid the $2500 nor gave the mortgage.

Between the time the motion was filed and the time it was heard, Nigohosian, at Stoecker's behest, formed a corporation, M and M Realty Co., Inc., with Mr. and Mrs. Stoecker as the sole stockholders. Respondent retained all the stock certificates in his office. On August 20, 1975, two days after the corporation had been formed, respondent prepared a deed to M and M Realty Co., Inc., and arranged for its execution by William H. Stoecker and Marie Stoecker, his wife, conveying title to the Guttenberg premises that were the subject of the May 14, 1975 stipulation of settlement.

Respondent's motion to set aside the settlement was denied on October 17, 1975. At the hearing on the motion Nigohosian did not disclose to the court or plaintiff's counsel that the property in question had been conveyed. Hence the form of order prepared by plaintiff's attorney after the October 17 hearing still contained a provision for a mortgage to be given by Mr. and Mrs. Stoecker, individually, with no reference to M and M Realty Co., Inc. Respondent's subsequent letter to the court objecting to the form of this order again failed to indicate that Stoecker was not the record owner of the property.

Because of respondent's objection to the form of the order, still another court appearance was required, on November 21, 1975. At this hearing the trial court expressed reservation about the propriety and efficacy of any order that might compel Mrs. Stoecker to execute a mortgage, she not having been a party to the underlying litigation with Panther Valley. The attorney appearing in respondent's stead informed the court that Mrs. Stoecker would not voluntarily sign a mortgage, whereupon plaintiff's attorney abandoned his request for a mortgage provision. Up to this point there still had been no disclosure of the transfer of the Guttenberg property. The court disposed of the matter by ordering that judgment be entered in plaintiff's favor against Mr. Stoecker for $3000, "but a payment of $2500 before January 15, 1976 will thereupon pay and discharge that judgment" in full. An appropriate order for judgment to that effect was executed on December 5, 1975, with no provision for any mortgage.

This did not, however, bring the proceedings to a close. In mid-December, without Nigohosian's knowledge, Stoecker obtained a loan of $20,000 to M and M Realty Co., Inc., secured by a second mortgage on the Guttenberg property.[1] Then Nigohosian filed a notice of appeal and moved for an order to

---

[1]The record strongly suggests that getting title of the property into a corporation was a prerequisite to the obtaining of any mortgage financing because of the higher interest rate chargeable by the lender.

stay execution of the judgment.[2] Inexplicably, he followed this on January 30, 1976 with a letter to plaintiff's attorney, "reiterat[ing] my previous offer to provide you with Mr. William Stoecker's mortgage in the amount of $3,000.00 per the settlement * * * memorialized by the transcript of the hearing * * * on May 14, 1975" (the original $2500-cash-or-$3000-mortgage settlement that respondent had successfully moved to have set aside). A copy of this letter, in which Nigohosian three times berated plaintiff's attorney for not accepting "the above mortgage," went to the trial court—this despite the notice of appeal and, more significantly, notwithstanding Stoecker's manifest inability, as well known by Nigohosian, to furnish a mortgage in his individual capacity.

This settlement offer to complete the mortgage transaction prompted plaintiff's attorney to obtain a property check, which revealed to him for the first time the change of title and the additional mortgage. Thereupon he filed a lis pendens against the corporation, started an action for fraudulent conveyance, obtained an order for supplemental proceedings, and made a settlement demand contemplating in part the giving of a mortgage by M and M Realty Co., Inc. The eventual, albeit long drawn-out, result of all this was that Stoecker's appeal was abandoned and the remaining actions dissipated when the underlying judgment was finally satisfied by way of levy on Stoecker's assets and by a small voluntary payment. The matter was not fully disposed of until after plaintiff's attorney caused these ethics proceedings to be instituted—more than two years after the original settlement.

---

[2]Without deciding the point, because it is not even tangentially before us, we nevertheless observe in passing that an appeal was not frivolous at least to the extent that it attacked so much of the trial court's December 5 order as required Stoecker to pay counsel fees totalling $1350 to plaintiff's attorney and his own original attorney. The court cited no authority for that provision and we know of none. It seems plainly—and unwarrantedly—punitive.

On the basis of the foregoing the DRB concluded, and we agree, that by arranging the August 1975 conveyance from Stoecker to M and M Realty Co., Inc., of realty subject to the May 14, 1975 stipulation of which he was aware, Nigohosian made himself a party to subversion of that stipulation. He breached his duty to both counsel and the court by failing to disclose the true state of the title. In addition, we find that this violation was aggravated by respondent's affirmatively misleading counsel and the court in the January 1976 letter resurrecting the then-impossible settlement arrangement that included Stoecker's personal mortgage.

█ Nigohosian undertakes to justify his conduct with the assertion that the transfer of title to the Guttenberg property in reality made assets—namely, shares of stock in the corporation—readily available to Stoecker's creditors. The argument is that the trial court could have ordered the sale of those shares to satisfy any obligation of Stoecker. However, respondent effectively foreclosed that avenue of relief by concealing the fact of the conveyance to the corporation. We do not suggest that an attorney has a continuing obligation under all circumstances to inform the court and opposing counsel of the state of a client's assets; but surely when an asset is the subject matter of a stipulation before the court and is later referred to in a circulating order, an attorney has a duty of disclosure of any significant fact touching upon the status of that property.

That respondent was fully aware of the sensitive aspects of transferring the Guttenberg property to a newly-formed corporation is abundantly clear from the following:

Q At the time you formed the corporation for [Stoecker], did he either seek any advice from you or did you give him any advice with regard to disposing of assets or cancelling assets so as to defraud any potential creditors?

A I told Mr. Stoecker I had to be certain in my own mind that there was no chicanery in the matter and there was sufficient assets to meet the judgment so there was nothing later on. I went into with Mr. Stoecker what the consequences were and I pointed out to Mr. Stoecker the serious consequences of a fraudulent conveyance.

▉ Under the circumstances the obligation to make disclosure could not be more clear. The failure to fulfill that obligation amounts to a violation of *DR* 1–102(A)(4), prohibiting conduct involving dishonesty, fraud, deceit or misrepresentation, and *DR* 1–102(A)(5), dealing with conduct prejudicial to the administration of justice. We continue to honor the premise that "an attorney is under a duty, when the proper administration of justice so requires, to disclose all pertinent and relevant facts to the court so that it may act fairly." *In re Turner*, 83 *N.J.* 536, 539 (1980).

## II

### Tuncay Matter

We adopt the DRB's factual findings and conclusions on the Tuncay matter. In significant respects the DRB's report reads as follows:

The respondent was retained by Sahil Tuncay in October of 1976 to represent him in obtaining a lease from Marl Associates, owner of a service station at 350 Grand Avenue, Leonia, New Jersey, then operated by Tuncay without a lease. The $100 retainer requested by respondent was never paid despite several requests.

A proposed lease was received by respondent from the owner's attorney in late October. However, in December the respondent was advised that the owners intended to sell the gas station to another party rather than lease the premises to Tuncay. Interest in purchasing the property was thereafter expressed by Tuncay and Donald Barton, who proposed to form a corporation known as Leonia Gulf. Following purchase by Leonia Gulf, the corporation was to make available to Tuncay a lease comparable to that originally proposed by Marl. A contract of sale providing for the purchase of the property by Leonia Gulf was signed by Barton * * * on December 22, 1976.

Closing of title was scheduled for May 9, 1977. Tuncay allegedly advised Barton at that time that he had changed his mind and wanted only a lease to operate the service station. He reiterated his unwillingness to participate in the purchase during a meeting that day between Barton, Tuncay and respondent. At that time, Tuncay was represented by another attorney, who was also present at this meeting. The respondent then determined to participate personally in the purchase as an equal stockholder with Barton in Leonia Gulf, Inc., and to be a director and officer of the corporation. He neither advised Tuncay of his participation nor obtained his consent. Closing took place on June 20, 1977.

The respondent corresponded directly with Tuncay regarding a lease of the gas station property on August 4, 1977. Correspondence then occurred between

respondent and Tuncay's new attorney, regarding a lease arrangement and certain alleged "conflicts of interest." On October 12, 1977, respondent wrote directly to Tuncay, threatening him with removal from the premises if arrearages were not paid within seven days. A copy of that letter was not sent to Tuncay's counsel, since respondent apparently felt that he was acting in his capacity as director of the corporation which owned the property. However, the phrase "attorney-at-law" appeared below the respondent's name at the bottom of that letter.

By letter dated October 21, 1977, Tuncay's attorney objected to respondent's action in corresponding directly with Tuncay. In March of 1978, the respondent instituted an action for rent arrearages and a dispossess action against Tuncay. Tuncay filed an ethics complaint in April of that year. In May, the respondent met with Tuncay and his attorney and a reduced rent was agreed upon. As part of the negotiations, the respondent requested and obtained a withdrawal of the ethics complaint and a general release. Pursuant to R. 1:20–5(f) the District II Ethics Committee pursued the matter, and concluded that the respondent acted improperly in purchasing the Leonia service station without notice to or consent by Tuncay, that he utilized information obtained via an attorney-client relationship to that client's disadvantage and that he improperly communicated directly with Tuncay rather than Tuncay's attorney in violation of DR 4–101 [dealing with preservation of confidences and secrets of a client] and DR 7–104 [covering communicating with one of adverse interest].

> \* \* \* \* \* \* \* \*

With regard to [the Tuncay matter], the respondent has admitted impropriety in corresponding directly with Tuncay rather than with his attorney.

In addition, having first participated in the negotiations as attorney for Tuncay, respondent purchased an interest in the ownership of the premises in question without his former client's approval, and then negotiated with his former client, albeit primarily through the new attorney for that client, on the same matter in which he had first represented Tuncay.

In these actions, respondent was guilty of serious violations of our ethical standards as set forth in DR 7–104(A)(1) and DR 4–101(B)(3). See In re Russell, 59 N.J. 315 (1971); In re Kent, 39 N.J. 114 (1963) and In re Carlsen, 17 N.J. 338 (1955).

See also In re Cipriano, 68 N.J. 398 (1975); In re Ryan, 66 N.J. 147 (1974).

## III

 The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances. In the Stoecker matter respondent has been found wanting in elemental candor with the court—candor called for not as a matter of courtesy but as an integral

ingredient of a professional obligation. In the *Tuncay* transaction respondent was blind to a conflict that resulted in his threatening to dispossess his former client from the very property with respect to which he had formerly represented that client. These derelications are an affront to the integrity that lies at the heart of the administration of justice. See *In re Cipriano, supra,* 68 *N.J.* at 404.

The appropriate discipline under the circumstances is suspension from the practice of law for six months. Respondent shall reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts and accounting expenses.

So ordered.

*For suspension* —Chief Justice WILENTZ, and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK —6.

*Opposed* —none.

## ORDER

It is ORDERED that LEON NIGOHOSIAN of Fort Lee be suspended from the practice of law for six months and until the further order of this Court, effective March 1, 1982; and it is further

ORDERED that LEON NIGOHOSIAN be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that LEON NIGOHOSIAN comply with all of the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys; and it is further

ORDERED that LEON NIGOHOSIAN reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts and accounting expenses.