850 A.2d 477

IN THE MATTER OF JACK L. SEELIG, AN ATTORNEY AT LAW.

Argued June 3, 2003—Decided June 24, 2004.

*Brian D. Gillet,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Michael E. Riley* argued the cause for respondent (*Riley & Lifrak,* attorneys).

*Mark Paul Cronin,* Deputy Attorney General, argued the cause for amicus curiae State of New Jersey (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Mr. Cronin and Russell J. Curley,* Deputy Attorney General, on the brief).

*Robert S. Bonney, Jr.,* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Bonney, Epstein & Gilberti,* attorneys; *Mr. Bonney and John C. Whipple,* on the letter brief).

Chief Justice PORITZ delivered the opinion of the Court.

Respondent Jack L. Seelig was admitted to the practice of law in the State of New Jersey in 1972. He has been a certified Criminal Trial Attorney for more than two decades and had not been the subject of disciplinary proceedings before this matter arose. On September 22, 2000, however, the District III–B Ethics

Committee (Burlington County) filed a complaint alleging that respondent had violated *Rule of Professional Conduct* (1984) (*RPC*) 1.6(b)(2) ("A lawyer shall reveal such information to the proper authorities, as soon as, and to the extent the lawyer reasonably believes necessary, to prevent the client from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to perpetrate a fraud upon a tribunal."); *RPC* 3.3(a)(1) ("A lawyer shall not knowingly make a false statement of material fact or law to a tribunal."); *RPC* 3.3(a)(5) ("A lawyer shall not knowingly fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure."); *RPC* 8.4(c) ("It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."); and, *RPC* 8.4(d) ("It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.").[1] The violations asserted in the complaint arose out of certain acts and omissions attributed to respondent during his representation of Jeffrey Poje in an underlying matter involving both motor vehicle offenses and indictable charges. The facts of the Poje case and the conduct of respondent as Poje's attorney are provided insofar as they are necessary for a disposition of the ethics complaint.

## I.

On January 1, 1998, at around 2:00 a.m., Jeffrey Poje was driving an automobile that collided with a disabled vehicle being pushed along the right lane of traffic on Route 31 (Pennington Avenue) in Ewing Township. As a result of the accident, the person pushing the vehicle died at the scene and a woman who

---

[1] On December 20, 2000, during the District III–B Ethics Committee hearing the complaint was amended to include an alleged violation of *RPC* 3.3(d) ("In an ex parte proceeding, a lawyer shall inform the tribunal of all relevant facts known to the lawyer that should be disclosed to permit the tribunal to make an informed decision, whether or not the facts are adverse.").

was behind the wheel suffered severe injuries. She died two days later on January 3, 1998.

Poje initially fled on foot but then turned himself in that same day. He was arrested and charged by the Mercer County Prosecutor with aggravated manslaughter and death by auto in respect of the deceased victim, and aggravated assault in respect of the injured victim. (When the second victim died, the prosecutor amended the charges to reflect an additional count of aggravated manslaughter and death by auto.) Poje's arraignment hearing also took place on January 1 before Municipal Court Judge William M. Lake of the Ewing Township Municipal Court, after which Poje was transferred to the Mercer County Detention Center. On January 5, 1998, the Superior Court set bail at $250,000.[2]

At some point during the week following his arrest, Poje retained respondent as defense counsel. Respondent engaged in discussions about bail and other matters with William Zarling, the Assistant Prosecutor handling the investigation, until January 9 when respondent was informed that Deputy First Assistant Prosecutor Katherine Flicker had assumed responsibility for the prosecution. During the week of January 12, respondent contacted Flicker. Later, they saw one another and discussed bail issues and Poje's prior driving record. At that time, Flicker told respondent that she would "alert him when [her] investigation was completed so that [they] could talk before the case was presented to [a] grand jury." That week, also, on January 15, 1998, the Ewing Township Police Department issued three motor vehicle summonses against Poje for violations of *N.J.S.A.* 39:4–96 (reckless driving), *N.J.S.A.* 39:4–129 (leaving the scene of an accident), and *N.J.S.A.* 39:4–130 (failing to report an accident). Each of the three summonses indicated an accident involving personal injury and property damage and listed a court date of February 18, 1998.

---

[2] *Rule* 3:26–2(a) limits the authority of the municipal court to set bail on a charge of aggravated manslaughter.

Respondent filed a Notice of Representation with the Ewing Township Municipal Court on behalf of Poje, entering pleas of "not guilty" to the motor vehicle charges. The filing further requested transportation for Poje from the Detention Center to the municipal court; however, due to administrative oversight, Poje was not brought to the court on February 18 and the matter was carried over one week. On February 25, 1998, Poje appeared before Judge Lake in prison clothing and represented by respondent. It was customary for the municipal prosecutor handling such cases to meet privately with defense counsel beforehand. As to this matter, each attorney gives a slightly different account of their conversation. The municipal prosecutor remembers asking, "What do you got, Jack?" and hearing in response, "I got someone coming over from the jail." The prosecutor recalls walking away at that point. According to respondent, he also said "[M]y matter, *State v. Poje,* and my client's pleading guilty to the charges." Respondent claims that the prosecutor then said, "Do you need me?" and that he answered, "No." Respondent never mentioned the indictable offenses filed against Poje and the prosecutor was not aware of them.

Judge Lake called Poje's case when the prosecutor was out of the courtroom and respondent entered a guilty plea on behalf of his client. The court then asked:

THE COURT: How long are we in for?

MR. [SEELIG]: We don't know yet.

THE COURT: Oh. Are we in for quite a while? (Indiscernible words)—make any sense to not do fines, but—

MR. [SEELIG]: You can do fines. We'll—we'll pay 'em. You wanna tell me what the fines are in each ticket? We'll—

THE COURT: Reckless driving. (Indiscernible—loud background noise) Report an accident, leaving the scene of an accident. Injuries or property damage?

MR. [SEELIG]: Injuries.

After only a short further colloquy related to the imposition of fines, the court accepted the guilty pleas and imposed $630 in fines and $90 in court fees. The court never inquired into the extent of the injuries, never directly addressed Poje to determine whether the plea was knowing and voluntary, and never set forth on the

record the factual basis for the plea as required by *Rule* 7:6–2(a)(1). And, despite Poje's prison clothing, the court did not even ask why Poje had been incarcerated. For his part, respondent never explained that two people died from the "injuries" caused by the accident.

Judge Lake advised the Mercer County Prosecutor's Office the following day that he had accepted a plea from Poje on the motor vehicle offenses because he had not recognized Poje as the person who had appeared before him earlier on the charges of aggravated manslaughter and death by auto. Directive No. 10–82, issued by the Administrative Director of the Courts on May 3, 1983, instructs the municipal courts in respect of "violation[s] involving a motor vehicle accident resulting in death or serious personal injury." The directive specifically places the responsibility on the municipal court judge or municipal court clerk to notify the County Prosecutor about such violations in order to give the prosecutor an opportunity to consider whether indictable offenses are involved. When the Prosecutor decides to proceed before the grand jury, the municipal court proceedings are stayed unless and until the Prosecutor notifies the municipal court that the grand jury has failed to return an indictment or that the matter has been dismissed.

The acceptance of Poje's guilty plea in contravention of Directive No. 10–82 raises double jeopardy issues in connection with prosecution on the charged indictable offenses. In *State v. Dively*, this Court held that "Motor Vehicle violations tried in municipal courts are within the category of offenses subject to the Double Jeopardy Clause," 92 *N.J.* 573, 586, 458 *A.*2d 502 (1983), and required the entry of a judgment of acquittal on remand to the trial court because the defendant had pleaded guilty to a merged reckless driving/drunk driving charge. *Id.* at 570, 587, 458 *A.*2d 502. Directive No. 10–82 was issued to establish a procedure for "cooperation between municipal courts, municipal prosecutors, and county prosecutors ... [to ensure that] more serious crimes are tried in the court of plenary jurisdiction as intended [by the

Legislature], rather than disposed of in the municipal court for an infraction of a substantially minor nature." *Id.* at 589, 458 *A.*2d 502. In this instance, the criminal complaint and the motor vehicle complaint against Poje were not cross-referenced to one another. Moreover, an affidavit submitted by the Ewing Township Municipal Court Administrator to the District Ethics Committee indicates that at the time Poje faced motor vehicle charges there were no procedures in place to satisfy the mandates of Directive No. 10–82.

The Mercer County Prosecutor filed a motion on March 5, 1998 to vacate Poje's guilty pleas based on substantial defects in the proceeding that resulted in a manifest injustice. The motion, citing *Dively*, asserted that unless the pleas were set aside, double jeopardy would bar the State from pursuing charges against Poje for the more serious indictable offenses. Judge R. Kevin McGrory, P.J.M.C., granted the motion on April 22, 1998. Subsequently, both the Law Division and the Appellate Division affirmed, and the case was remanded for trial on the merits.

## II.

Based on his conduct in Poje's case, the District III–B Ethics Committee (Burlington County) filed a complaint against respondent on September 22, 2000. *Supra* at 236–37, 850 *A.*2d at 479. A three-member panel of the Committee held hearings on November 30, 2000, and December 20, 2000, wherein respondent testified that he was familiar with the *Dively* case and therefore knew that Poje's guilty pleas could bar his prosecution for aggravated manslaughter and death by auto. Respondent stated that he neither disclosed the indictable offenses to the court nor informed the court that Poje's pleas had double jeopardy implications because, in his own words, "I have absolutely no obligation to." He further stated:

> I don't believe that a defense attorney has an obligation to perform the function of the [S]tate, whether it be the judge, prosecutor, the police, whatever.... If we get to the point where the defense attorney has to stand up and stop a proceeding because the court, the prosecutor ... [are] not doing their function, then we don't

have a Fifth Amendment right or Sixth Amendment right to a lawyer.... You have one side proceeding against the defendant without representation.

. . . .

I knew what was going on but its not my obligation to protect the [State].[3]

Respondent's position was, and is, that under the *New Jersey Rules* he was obligated to answer any question affirmatively presented to him but that he was not obligated to divulge unsolicited material facts. He testified that his client's Sixth Amendment right to counsel trumped any *RPC* suggesting otherwise and imposed on respondent a duty zealously to represent Poje short of an affirmative misrepresentation to the court. In that same vein, respondent asserted that he answered the questions put to him by the prosecutor and by the judge truthfully, albeit without elaboration that could damage his client's interests. Thus, for example, when the judge asked "Injuries or property damage?" respondent replied "Injuries" as the proper category of harm set forth in *N.J.S.A.* 39:4–129 [4] even though he was aware that Section 129(a) further distinguishes between "injuries or death." Similarly, in respondent's view, he appropriately responded "No" when the municipal prosecutor asked "Do you need me?" because respondent did not "need" the prosecutor to enter a guilty plea.

An expert on municipal court practices and attorney ethics testified in support of respondent's position at the Ethics Committee Hearing. The expert considered it

---

[3] In the transcript of the proceeding, Seelig is recorded as stating that "it is not my obligation to protect the defendant." The "State" has been substituted for the "defendant" to reflect respondent's views as expressed throughout his testimony.

[4] *N.J.S.A.* 39:4–129 is divided into two sections that state, in relevant part,

(a) The driver of any vehicle, knowingly involved in an accident resulting in injury or death to any person....

(b) The driver of any vehicle knowingly involved in an accident resulting only in damage to a vehicle, including his own vehicle, or other property which is attended by any person....

> Judge Lake's obligation to inquire as to the nature of the injury. It clearly was not the obligation of the defense advocate. We have different rules, in my opinion, for defense lawyers and prosecutors.... Prosecutors are there to seek justice. Defense lawyers are there to be zealous advocates.

The expert opined that respondent had a duty to his client and not to correct a breakdown in the judicial system.

The District III–B Ethics Committee issued its determination on August 10, 2001. A majority of the panel found "that respondent's conduct did not constitute ethical misconduct" and dismissed the complaint. The majority was satisfied that respondent "reasonably, completely, and truthfully" answered the questions addressed to him and concluded that

> [n]otwithstanding the allegations which have been presented, the record in this matter does not provide clear and convincing evidence that an ethical violation has been committed by the respondent. While *RPC* 1.6(b)(2) ... would require disclosure of information to appropriate authorities to prevent a client from perpetrating fraud upon a tribunal, the guilty pleas entered for Mr. Poje did not constitute action which can fairly be characterized as criminal, illegal or fraudulent, as is necessary to trigger the disclosure requirement.... The impetus for these pleas may certainly have been, at least in part, the collateral consequence of avoidance of prosecution under different charges through assertion of his rights under the Double Jeopardy Clause of the U.S. Constitution. Nevertheless, these pleas were entered in proceedings initiated and prosecuted by the State of New Jersey within the criminal justice system of the State. While ADC Directive No. 10–82 imposes certain reporting requirements upon certain officials ... it does not impose them upon persons in Mr. Poje's position or upon their attorneys.

Because *ex parte* proceedings generally involve a request for emergent relief in circumstances where the adversary "cannot be present," the majority also found that the mere absence of the prosecutor did not render the proceedings *ex parte*. Finally, the majority determined that respondent was not responsible for the indictable offenses, but rather for "effective assistance to his client in defending against the State's charges." Based on those conclusions, the charges against respondent were dismissed.

The dissenting member found that respondent's "consistent and repeated behavior of withholding information" misled Judge Lake and "demonstrated [respondent's] failure to disclose a material fact." The dissent acknowledged the duty of fidelity owed to a client by an attorney, but, quoting *In re Turner*, 83 *N.J.* 536, 539,

416 *A.*2d 894 (1980), maintained that the attorney "also owes a duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession."

The Disciplinary Review Board (DRB or Board) reviewed the matter *de novo* on February 7, 2002, and issued a decision on June 24, 2002, in which a four-member majority found clear and convincing evidence of unethical conduct by respondent.[5] Those members held that respondent's failure "to disclose that two deaths had occurred and that indictable charges were also pending against his client" misled the court, with the result that guilty pleas were improperly entered jeopardizing prosecution on the more serious offenses. That failure to disclose violated *RPC* 3.3(a)(5), which requires a lawyer to inform the court about a material fact when he or she has knowledge that without such information the court will be misled. The majority assumed that the judge would have stayed the proceedings in municipal court had he been properly informed because only one day after accepting the guilty plea the judge reached out to the Office of the Mercer County Prosecutor to "alert that office to his error." That respondent failed to inform the court in respect of critical facts already in the public domain and not subject to a claim of privilege also weighed in the decision of the four Board members. Ultimately, "[t]he majority concluded that respondent's failure to disclose material information to the court violated *RPC* 3.3(a)(5) and *RPC* 8.4(d)," [6] and decided that respondent should be reprimanded for his conduct.

---

[5] The Office of Attorney Ethics (OAE) had appealed the dismissal of the complaint by the District Ethics Committee in respect of claims that respondent violated *RPC* 3.3(a)(5); 3.3(d); 8.4(c); and 8.4(d).

[6] The majority found no violation of *RPC* 3.3(d) or *RPC* 8.4(c). The four members explained that *RPC* 3.3(d) was not applicable because the proceeding was not *ex parte*. Elaborating on the discussion of the District III–B Ethics Committee, the majority pointed out that *ex parte* proceedings typically address an emergent matter when "the party against whom relief is sought either has not received notice of the matter or cannot appear," and not when the adverse party elects not to appear, as in this case. Respondent also could not have violated

The three dissenting members of the DRB agreed with the decision of the District Ethics Committee to dismiss the charges. The dissent pointed out that respondent "merely answered the questions posed by the court and was not required to reveal additional information not requested of him." Further, the dissent believed that the imposition of discipline "would be inequitable [in light of] the absence of prior notice that respondent's action constituted wrongdoing."

Under *Rule* 1:20–15(c) the imposition of discipline requires the concurrence of five members of the DRB. It follows that in this case a final determination of the Board has not issued. This Court issued an Order to Show Cause "why [respondent] should not be disbarred or otherwise disciplined" on May 9, 2003. The Association of Criminal Defense Lawyers of New Jersey and the Attorney General of New Jersey were granted *amicus curiae* status on May 6, 2003 and May 14, 2003, respectively.

## III.

■ *Rule of Professional Conduct* 3.3(a)(5) states that "[a] lawyer shall not knowingly fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure." [7] On its face, the rule applies to respondent's "fail[ure] to disclose" Poje's pending indictable offenses to the municipal court, *i.e.*, respondent acknowledges that his failure was knowing and there can be no dispute that the information

---

*RPC* 8.4(c), according to the majority, because he withheld information about Poje's indictable offense in good faith. Respondent's belief that he was acting ethically "precluded a finding that he intended to deceive the court."

[7] On January 1, 2004, certain amendments to the *New Jersey Rules* took effect, including changes to *RPC* 3.3(a)(5). For the revised rule see *infra* at 247, 850 A.2d at 485. We consider respondent's conduct under the pre-amendment version of *RPC* 3.3(a)(5) because the events that led to the filing of the ethics complaint occurred prior to the effective date of the amendments. We add, however, that our determination in this case would not change under *RPC* 3.3(a)(5) as amended.

withheld was material. Nonetheless, the genesis of *RPC* 3.3(a)(5), and the case law applying the rule are instructive in respect of respondent's obligations under the rule. We begin then with the origins of *RPC* 3.3(a)(5).

## A.

*Rule of Professional Conduct* 3.3(a)(5) has no analogue in the American Bar Association (ABA) *Model Rules of Professional Conduct* (1983) (*ABA Model Rules*). When in 1977 the ABA undertook a review of what was then the ABA *Model Code of Professional Responsibility* (1980), the Association convened the Commission on Evaluation of Professional Standards chaired by Robert Kutak. The Kutak Commission proposed substantial revisions in the form of *ABA Model Rules* that were adopted by the Association's House of Delegates in final version on August 2, 1983. In New Jersey, the Supreme Court Committee on the Model Rules of Professional Conduct, chaired by United States District Court Judge Dickinson R. Debevoise, was asked to consider the proposed *ABA Model Rules* in July 1982. On June 24, 1983, the Debevoise Committee issued its report wherein *ABA Model Rule* 3.3 ("Candor Towards the Tribunal") was recommended for adoption in this State. That proposed rule did not contain Subparagraph 3.3(a)(5); rather, Subparagraph 3.3(a)(5) was added by the Court and adopted as a new addition to the rule when the Court approved the *New Jersey Rules* on July 12, 1984.

In the late 1990's, the ABA again considered substantial revisions to the *ABA Model Rules*. And, again, in 2001, our Court appointed a Commission, this time chaired by retired Associate Justice Stewart G. Pollock, to review the *New Jersey Rules* in light of the recommendations developed by the ABA Ethics 2000 Commission. The report issued by the Pollock Commission referred to extensive discussions concerning *RPC* 3.3(a)(5), with the result that the Commission "narrowly" voted to recommend maintaining the pre-existing rule. The report stated:

Our Commission narrowly rejected a proposal to recommend deletion of *RPC* 3.3(a)(5) and to amend *RPC* 3.3(a)(1) to provide that "a lawyer shall not knowingly make a false or misleading statement of material fact or law to a tribunal." Although the Commission supports the retention of existing *RPC* 3.3, it recognizes the tension that the rule places on the attorney-client relationship in placing an affirmative duty on the attorney to disclose material facts that are adverse to the attorney's client.

At the Court's Administrative Hearing on the Rule Proposals, the New Jersey State Bar Association voiced its dissatisfaction with *RPC* 3.3(a)(5). The Bar Association recommended eliminating the rule because, in its view, the rule is unclear, is inconsistent with the traditional values of the adversarial system, strains the attorney-client relationship, and makes New Jersey an outlier relative to the *ABA Model Rules* and the rules of other states. Despite those concerns, the Court adopted *RPC* 3.3(a)(5) on January 1, 2004, with certain revisions intended to clarify the scope of the rule in respect of required disclosure. The amended rule states:

(a) A lawyer shall not knowingly:

. . . .

(5) fail to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead the tribunal, except that it shall not be a breach of this rule if the disclosure is protected by a recognized privilege or is otherwise prohibited by law.

[*RPC* 3.3(a)(5) (amended 2004).]

## B.

Even prior to the adoption of the *New Jersey Rules* in 1984, the Court had occasion under the old Canons of Professional Ethics to consider questions related to a lawyer's obligation of disclosure to the tribunal. *See, e.g., In re Nigohosian*, 88 *N.J.* 308, 442 *A.*2d 1007 (1982) (finding ethical infraction when attorney neglected to inform court that his client transferred asset subject to settlement thereby affecting case management because asset was no longer available to resolve legal action); *In re Herbstman*, 84 *N.J.* 485, 421 *A.*2d 592 (1980) (disciplining attorney for certifying to court about ownership of fund under attorney's control without mention

of competing claims made against fund); *In re Turner,* 83 *N.J.* 536, 416 *A.*2d 894 (1980) (finding ethical infraction when attorney failed to advise court about client's receipt of monies in the course of receivership action). *In re Nigohosian, In re Herbstman,* and *In re Turner,* enunciate the principle that "an attorney is under a duty, when the proper administration of justice so requires, to disclose all pertinent and relevant facts to the court so that it may act fairly." *Id.* at 539, 416 *A.*2d 894. Further, as pointed out by the Comments to *RPC* 3.3(a)(5), those cases extend this duty to both "facts that are at issue in the case [and] facts relating to the management of the case." *RPC* 3.3, cmt. *Rule of Professional Conduct* 3.3(a)(5), then, reflects the codification of legal precedent imposing a heightened duty of candor towards the tribunal not explicitly included in the *ABA Model Rules.*

Indeed, those cases express, as does the text of *RPC* 3.3(a)(5), this Court's understanding of the "double character" of an attorney's "duty," as described in *In re Turner, supra,* 83 *N.J.* at 539, 416 *A.*2d 894 (quoting *People v. Beattie,* 137 *Ill.* 553, 27 *N.E.* 1096, 1103 (1891)). In *Turner,* we stated:

[An attorney] owes to his client the duty of fidelity, but he also owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions.

[*Ibid.* (quoting *Beattie, supra,* 137 *Ill.* at 574, 27 *N.E.* at 1103).]

That understanding is shared by courts and commentators around the country. *See, e.g., United States v. Associated Convalescent Enters., Inc.,* 766 *F.*2d 1342, 1346 (9th Cir.1985) ("An attorney does not simply act as an advocate for his client; he is also an officer of the court."); *Virzi v. Grand Trunk Warehouse & Cold Storage Co.,* 571 *F.Supp.* 507, 511 (E.D.Mich.1983) ("While it is expected that each lawyer will contend with zeal for the rights of his client, nevertheless he owes an affirmative duty of absolute candor and frankness to the court which transcends his private employment.") (citation omitted); *In re Stump,* 272 *Ky.* 593, 114 *S.W.*2d 1094, 1097 (1938) ("It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He

owes a definite responsibility to the public in the proper administration of justice."); *In re Integration of Neb. State Bar Ass'n*, 133 *Neb.* 283, 275 *N.W.* 265, 268 (1937) ("An attorney owes his first duty to the court. He assumed his obligation toward it before he ever had a client. His oath requires him to be absolutely honest even though his client's interests may seem to require a contrary course."); *People v. DePallo*, 96 *N.Y.*2d 437, 729 *N.Y.S.*2d 649, 754 *N.E.*2d 751, 753 (2001) ("[A]n attorney's duty to zealously represent a client is circumscribed by an 'equally solemn duty to comply with the law and standards of professional conduct ....' ") (citation omitted); William H. Simon, *Ethical Discretion in Lawyering*, 101 *Harv. L.Rev.* 1083, 1133 (1988) ("[T]he lawyer has been both an advocate and 'an officer of the court' with responsibilities to third parties, the public, and the law.").

Yet, in each case, the multiple roles and potentially conflicting duties described by those courts and commentators must be examined to sort out in a specific context the extent of the duties imposed and the precedence of one over another. In that regard, New Jersey has taken a distinctive approach. As recognized by Professor Michael Ambrosio:

> The New Jersey Rules place the public interest before the interests of both clients and lawyers.... [In this way, the] New Jersey Supreme Court has given a different interpretation to the idea that in an adversarial system of justice, a lawyer's duty of loyalty to his client is the same as his duty to the legal system. Although traditional adversarial ethics (reflected in former rules) provide a legal and, perhaps, a moral justification to ignore the public interest when pursuing the interests of a client, the New Jersey Rules clearly do not.
>
> [Michael P. Ambrosio, *The "New" New Jersey Rules of Professional Conduct: Reordered Priorities for Public Accountability*, 11 *Seton Hall Legis. J.* 121, 130 (1987).]

In other words, the *New Jersey Rules* shift the focus, in certain circumstances, from the client's interest to the legal system and the public interest. *Rule of Professional Conduct* 3.3(a)(5) is a paradigm for that shift. *Id.* at 138.

Thus, although *RPC* 3.3(a)(5) is not a new rule of law, it does represent an alteration of the balance in respect of lawyers' responsibilities. Both the *ABA Model Rules* and the *New Jersey*

*Rules* dismiss misrepresentation as a permissible litigation tactic, even when carried out in the name of zealous representation. *ABA Model Rule* 3.3(a)(1) prohibits a lawyer from making "false statements of fact or law to a tribunal," as does our rule. Moreover, the comments to the *ABA Model Rule* expressly state that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *Model Rules of Prof'l Conduct R.* 3.3 cmt. 3 (2003). Our *RPC* 3.3(a)(5) codifies the ABA comment, thereby establishing a "more stringent requirement of disclosure than the standard set forth by the Model Rules," *In re Forrest,* 158 *N.J.* 428, 434, 730 *A.2d* 340 (1999), with the result that attorneys in New Jersey have been found to violate *RPC* 3.3(a)(5) when a failure to disclose material information misleads the court. *See, e.g., Kernan v. One Wash. Park Urban Renewal Assocs.,* 154 *N.J.* 437, 464–66, 713 *A.2d* 411 (1998) (Pollock, J., concurring) (stating that defense counsel in tort action violated *RPC* 3.3(a)(5) by failing to reveal that his client filed for bankruptcy); *In re Norton,* 128 *N.J.* 520, 537–41, 608 *A.2d* 328 (1992) (disciplining both defense attorney and prosecutor in drunk driving action for not disclosing that charges were dropped without good cause); *In re Whitmore,* 117 *N.J.* 472, 475–80, 569 *A.2d* 252 (1990) (finding municipal prosecutor in violation of *RPC* 3.3(a)(5) when he failed to inform court that police officer was intentionally unavailable due to "corrupt agreement" and court dismissed drunk driving charge). *See also* Marvin E. Frankel, *The Search for Truth: An Umpireal View,* 123 *U. Pa. L.Rev.* 1031, 1057 (1975) (suggesting that our legal system undervalues truth and recommending modification of ethics rules to "compel disclosures of material facts and forbid material omissions rather than merely [to] proscribe positive frauds.").

## C.

Case law subsequent to the adoption of *RPC* 3.3(a)(5) provides guidance to attorneys concerned about the scope of the rule. For example, in *In re Forrest, supra,* plaintiffs husband and wife

brought a personal injury action after an automobile accident in which both were injured. 158 *N.J.* at 430–31, 730 *A.*2d 340. Subsequently, the husband "died . . . for reasons unrelated to the . . . accident." *Id.* at 431, 730 *A.*2d 340. Plaintiffs' counsel appeared at an arbitration explaining only that the husband was " 'unavailable.' " *Ibid.* When the arbitrator awarded $6,000 to the husband, defense counsel requested that the husband submit to a physical examination. Only after ten months, a motion by defense counsel to produce the husband, and a court order requiring the husband's appearance, did the lawyer disclose that his client had died. In a subsequent disciplinary action, this Court held that plaintiffs' counsel violated *RPC* 3.3(a)(5) by withholding information from the arbitrator and the court even though disclosure would have adversely affected his client. We stated: "To withhold information about [plaintiff's] death from the arbitrator effectively prevented the arbitrator from properly discharging his responsibilities under the court rules." *Id.* at 435, 730 *A.*2d 340. We found that "[r]espondent's nondisclosure . . . deceived both his adversary and the arbitrator about a fact that was crucial to fair and proper resolution of the litigation." *Id.* at 438, 730 *A.*2d 340.

*Kingsdorf v. Kingsdorf,* 351 *N.J.Super.* 144, 797 *A.*2d 206 (App. Div.2002), reflects the Appellate Division's understanding of *RPC* 3.3(a)(5). In that case, the attorney represented the guardian of an incapacitated person filing for divorce. The parties in the divorce action reached a settlement agreement that they intended to sign on entry of the judgment for divorce. *Id.* at 148, 797 *A.*2d 206. Shortly thereafter, the incapacitated spouse died. Although the lawyer knew about the death, the information was not provided to either opposing counsel or the court prior to the execution of the consent final judgment of divorce. *Ibid.* The Appellate Division condemned the lawyer's conduct, stating that "[a] lawyer's responsibility to act with '[c]andor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interests of the client.' " *Id.* at 154, 797 *A.*2d 206 (quoting *Davin, L.L.C. v. Daham,* 329 *N.J.Super.* 54, 76, 746 *A.*2d 1034 (App.Div.2000)). The panel found that by keeping

silent, the lawyer had participated in "the perpetration of a fraud upon the court and the obtaining of a divorce by subterfuge." [8] *Ibid.*

In *In re Forrest* and *Kingsdorf*, the attorneys neither affirmatively misrepresented material information to the tribunal, nor evaded a direct question from the tribunal; rather, the attorneys held back the information in order to advance their clients' interests. The lesson of those cases is that "the proper administration of justice" requires attorneys in such situations to speak out so as to avoid misleading the court. *In re Turner, supra,* 83 *N.J.* at 539, 416 *A.*2d 894.

## IV.

In this case, respondent freely admits that he knew about the holding in *Dively* and understood the double jeopardy implications of a municipal court determination on motor vehicle violations that also constitute indictable offenses. He also knew that a properly informed municipal court judge would stay proceedings on the motor vehicle offenses pending the presentation of any indictable offenses to a grand jury. He understood that the municipal court was not properly informed and did what he could, short of affirmative misrepresentation, to ensure a disposition by the court on the motor vehicle summonses. After stating his client's intention to plead guilty, respondent assured the municipal prosecutor that his presence was not necessary at the hearing before the judge. And before the judge, respondent was terse, responding strictly and carefully to the questions expressly asked during the proceeding. In short, although the record lacks a specific instance of affirmative misrepresentation by respondent, it contains numerous opportunities for open and forthright responses informing court personnel, the municipal prosecutor, and the municipal judge

---

[8] The lawyer subsequently received a three-month suspension as a result of disciplinary proceedings that followed the decision in *Kingsdorf*.

about the indictable offenses arising from his client's motor vehicle accident.

Judge Brody, sitting on the DRB in this matter, likened respondent's obligation under *RPC* 3.3(a)(5) to the duty under *RPC* 3.3(a)(3) to "disclose to the tribunal legal authority ... known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." The comparison is apt. Both rules compel a lawyer to act affirmatively against his or her client's interests even when the primary responsibility for informing the court does not (or may not) lie with the lawyer. At their core, the rules impose a duty to disclose in order to prevent errors in decision making by a tribunal that is unaware of adverse legal authority or that has been misled because it lacks information about material facts. Respondent contends, however, that we should consider his conduct to be encompassed by the duty of zealous advocacy owed to his client and encouraged by our case law. In *Dively, supra*, we stated that a "breakdown in communications between the state and municipal officials forms no justification for depriving an accused of his right to plead double jeopardy." 92 *N.J.* at 589, 458 *A.2d* 502 (quoting *Robinson v. Neil*, 366 *F.Supp.* 924, 929 (E.D.Tenn.1973)). Respondent infers that he did nothing more than convert one such breakdown into a positive result for his client, as contemplated by *Dively*. But our comment, in context, simply explained why we were mandating "cooperation between the municipal courts and the county prosecutor"—to avoid double jeopardy problems in future cases. *Id.* at 589, 458 *A.2d* 502. We in no way intended to suggest that defense attorneys could or should ignore the dictates of *RPC* 3.3(a)(5) in situations like the one at bar.[9]

---

[9] Respondent also contends that *State v. Thomas*, 61 *N.J.* 314, 294 *A.2d* 57 (1972), supports his understanding of the rule. There, we said that "it forms no part of the duties of defense counsel to alert the State to imminent pitfalls or warn of possible missteps." *Id.* at 321, 294 *A.2d* 57. Respondent ignores the preceding language in *Thomas*, where we stated that the "zeal displayed [by defense counsel] must not transcend the bounds imposed by law or by those *ethical standards* and professional proprieties which govern the conduct of all

 Most important, respondent claims that his zealous advocacy was compelled by his client's Sixth Amendment right to counsel guaranteed by the United States Constitution. *U.S. Const.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."). He argues that, even if he has violated our *New Jersey Rules*, his client's right superceded any professional duty owed by respondent to the judicial system.

First, we observe that the recent amendment to *RPC* 3.3(a)(5) states "that it shall not be a breach of this rule if the disclosure is protected by a recognized privilege or is otherwise prohibited by law." The new language expressly conveys exceptions implicit in the version of the rule that is operative in this case and that are, in part, explicitly described in the Debevoise Committee Report. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, *N.J.L.J.*, July 28, 1983, *R.* 4.1, cmt. (explaining that "the constitutional rights of defendants in criminal cases must take precedence over any Rule permitting or mandating disclosure."). Consideration of the disclosure requirement under *RPC* 3.3(a)(5) clearly must take into account any competing constitutional right that delimits the scope of the rule.

 The United States Supreme Court discussed the interplay between the Sixth Amendment right to counsel and an attorney's ethical responsibilities in *Nix v. Whiteside,* 475 *U.S.* 157, 106 *S.Ct.* 988, 89 *L.Ed.*2d 123 (1986). Counsel's duty of loyalty to his or her client is, under *Nix,* "limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth." *Id.* at 166, 106 *S.Ct.* at 994, 89 *L.Ed.*2d at 134. In that case, a state-appointed lawyer admonished a client facing murder charges to refrain from testifying falsely. Throughout pretrial preparations, the defendant said that although he did not see a gun, he believed the individual he stabbed had a gun on his person. *Id.* at 160–61,

---

members of the bar at all times." *Ibid.* (emphasis added). In any case, *Thomas* was decided in 1972 before the Court adopted *RPC* 3.3(a)(5).

106 *S.Ct.* at 991, 89 *L.Ed.*2d at 131. Just before trial, the defendant told his counsel he intended to change his story and testify that he saw something "metallic" in his victim's hand because "[i]f I don't say I saw a gun, I'm dead." *Id.* at 161–62, 106 *S.Ct.* at 991, 89 *L.Ed.*2d at 131. The lawyer attempted to dissuade the defendant from committing perjury and threatened to advise the court if defendant insisted on so testifying. *Id.* at 161, 106 *S.Ct.* at 991, 89 *L.Ed.*2d at 131. Following defendant's conviction, he petitioned for a writ of habeas corpus alleging ineffective assistance of counsel because his lawyer had prevented him from testifying as he preferred. *Id.* at 162, 106 *S.Ct.* at 992, 89 *L.Ed.*2d at 132.

The Supreme Court held that a criminal defendant's right to assistance of counsel does not include the right to cooperation in the commission of perjury in violation of the ethical standards established by states to govern attorney conduct. *Id.* at 175–76, 106 *S.Ct.* at 998–99, 89 *L.Ed.*2d at 140–41. Because an attorney does not function merely as an advocate but also as an officer of the court, the "attorney's ethical duty to advance the interests of his [or her] client is limited by an equally solemn duty to comply with the law and standards of professional conduct. . . ." *Id.* at 168, 106 *S.Ct.* at 995, 89 *L.Ed.*2d at 133–34.

*United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984), also dealt with a defendant's right to the assistance of counsel. In discussing the contours of the Sixth Amendment, the Court stated:

> The substance of the Constitution's guarantee of the effective assistance of counsel is illuminated by reference to its underlying purpose. "[T]ruth," Lord Eldon said, "is best discovered by powerful statements on both sides of the question." This dictum describes the unique strength of our system of criminal justice. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."
>
> [*Id.* at 655, 104 *S.Ct.* at 2044–45, 80 *L.Ed.*2d at 665 (citation omitted).]

Yet, the focus remains on the "ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is

generally not implicated." *Id.* at 658, 104 *S.Ct.* at 2046, 80 *L.Ed.*2d at 667. And, further, counsel certainly is not required to "do what is impossible or unethical." *Id.* at 657 n. 19, 104 *S.Ct.* at 2045, 80 *L.Ed.*2d at 666.

In this case, the issue is not whether respondent's client obtained a fair trial, but whether, because of double jeopardy considerations, a trial on the indictable offenses would have been possible at all after the municipal court acted. In that context, certainly, the Sixth Amendment right to effective assistance of counsel should not be invoked to thwart the administration of justice. *See Theard v. United States,* 354 *U.S.* 278, 281, 77 *S.Ct.* 1274, 1276, 1 *L.Ed.*2d 1342, 1345 (1957) (describing lawyer as "an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice") (quoting *Karlin v. Culkin,* 248 *N.Y.* 465, 162 *N.E.* 487, 489 (1928) (Cardozo, C.J.)). We conclude, therefore, that an attorney in the circumstances here presented is not prohibited by a client's Sixth Amendment rights, or any other duty owed the client, from informing the municipal court about pending indictable offenses and should do so to prevent the court from being misled by the attorney's silence.

## V.

▮ Notwithstanding that conclusion, we do not find that respondent should be disciplined. In his testimony before the District Ethics Committee, respondent repeatedly stated that he believed his duty to his client, and his client's Sixth Amendment right to counsel, required him to withhold information about the indictable offenses from the municipal court. Respondent took *Dively* and Directive No. 10–82 to confirm his understanding that the obligation to identify and coordinate his client's charges belonged to the County Prosecutor and the municipal court, and not defense counsel. Indeed, the municipal court's failure to ask about the victim(s) injuries, to pursue the reasons for Poje's imprisonment, or to put on the record a factual basis for Poje's

plea, is inexplicable. If the court had carried out its responsibilities properly, we likely would not have this case before us today.

Also, respondent's expert took the view that respondent had a duty not to speak. The expert characterized defense lawyers as "zealous advocates" who are not required "to provide inculpatory information to the prosecution. In fact, just the opposite. There is the obligation to keep the client's confidences." (We point out that this matter does not involve a client's confidences, which are privileged, or inculpatory information in the usual sense, but rather, information in the public record about offenses that can be alleged in a criminal complaint.) Respondent and his expert, in good faith, misunderstood the extent of an attorney's obligations under *RPC* 3.3(a)(5).

This is not a case about an attorney who was unaware of the Rules of Professional Conduct, *In re Eisenberg*, 75 *N.J.* 454, 456–57, 383 *A.*2d 426 (1978); it is a case in which the attorney believed that he had a superseding obligation to his client. Our prior case law in respect of *RPC* 3.3(a)(5) has not dealt with that issue. Perhaps because of a lack of guidance from our Court, a majority of the District III–B Ethics Committee believed that respondent had not acted improperly and dismissed the charges against him. Even the DRB was unable to garner the concurrence of five members of the Board for the imposition of discipline. When the totality of circumstances reveals that the attorney acted in good faith and the issue raised is novel, we should apply our ruling prospectively in the interests of fairness. *See In re Goldstein*, 116 *N.J.* 1, 5–6, 560 *A.*2d 1166, 1167–68 (1989) (finding that discipline is not appropriate because Court has never addressed issue in disciplinary context); *In re Hinds*, 90 *N.J.* 604, 630, 449 *A.*2d 483 (1982) (refraining from imposition of punishment in recognition of novel issue and new standard). This approach comports with our purpose in disciplinary cases, which "is not to punish[,] but to enlighten and improve the profession for the benefit of the public." *Ibid.* (citing *In re Baron*, 25 *N.J.* 445, 449,

136 *A.*2d 873 (1957)); *In re Goldstaub,* 90 *N.J.* 1, 5, 446 *A.*2d 1192 (1982). We therefore decline to discipline respondent in these circumstances.

As for the other allegations against respondent, we agree with the DRB that respondent did not violate either *RPC* 3.3(d) or *RPC* 8.4(c) for the reasons detailed in the Board's decision. *See supra* at 244–45 n. 6, 850 *A.*2d at 484 n. 6 (summarizing the Board's treatment of those rules with respect to respondent). Further, respondent's legitimate belief that he was acting ethically and in the best interests of his client is not consistent with a deliberate attempt to prejudice the administration of justice as prohibited by *RPC* 8.4(d).

## VI.

For the foregoing reasons, the decision of the Disciplinary Review Board is affirmed in part and modified in part.

Justice LaVECCHIA, concurring and dissenting.

I concur in the Court's opinion to the extent that it holds that the type of conduct exhibited by respondent violates the professional duty of candor and good faith to the tribunal that is required by *RPC* 3.3(a)(5). That conclusion is consistent with the letter and spirit of the *RPC* and its application in past cases, including criminal matters. My disagreement is with the determination not to find an ethical violation and not to impose any discipline in this matter.

We are not concerned here with the outer limits of an attorney's duty to inform the tribunal about factual information to which his client may testify, or not. Nor does this matter involve a question of privilege about which the Court concerned itself in the recent amendment clarifying *RPC* 3.3(a)(5). This case involves respondent's intentional withholding of publicly available information from the tribunal, knowing that the tribunal would be misled thereby. Indeed, respondent's testimony at his disciplinary hearing reveals that he intended to capitalize on the fruits of his conduct through a later claim of Double Jeopardy, a claim made

available as a consequence of his omission of critical information in his exchange with the court. *Ante* at 252–53, 850 *A.2d* at 488–89.

I respectfully dissent. I would impose a reprimand for respondent's sharp practice before Judge Lake in violation of *RPC* 3.3(a)(5).

*For affirmance in part/modify in part*—Chief Justice PORITZ and Justices LONG, VERNIERO, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part/dissenting in part*—Justice LaVECCHIA—1.